Banco Central Corp. (antes Banco Central y Economías), demandante y recurrente, *v.* Yauco Homes, Inc., etc., demandados y recurridos.

*Número:* RE-87-133    *Resuelto:* 9 de mayo de 1994

*Néstor Durán*, de *McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz Suria*, y *Hermán Cestero*, de *Sweeting, González & Cestero*, abogados del recurente; *Rubén T. Nigaglioni* y *María Soledad Piñero*, de *Ledesma, Palou & Miranda*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Recurre ante nos el demandante Banco Central Corp. (en adelante el banco) para que revisemos la parte de la sentencia del Tribunal Superior que declaró sin lugar la segunda causa de acción de la demanda, dirigida a exigirle a los demandados José Antonio Olivari Antongiorgi y María Luisa Olivari Antongiorgi (en adelante los vendedores) el cumplimiento específico de una obligación contractual de posposición de hipoteca. Tenemos que resolver si los ven-

dedores tienen que posponer su hipoteca a la que el banco posee en calidad de prenda.(¹) Revocamos.

I

Los vendedores, mediante la Escritura Núm. 89 de 18 de junio de 1973 —autorizada por el notario Carlos M. Franco Soto— vendieron a Villa Olimpia Development Corp. (en adelante la urbanizadora)(²) la finca objeto de este litigio por el precio aproximado de trescientos sesenta mil dólares ($360,000). La urbanizadora pagó un pronto de aproximadamente sesenta mil dólares ($60,000) y se obligó a pagar los restantes trescientos mil dólares ($300,000) en cuatro (4) plazos anuales, comenzando en junio de 1974 y terminando en junio de 1977.

En esta misma escritura de compraventa, la urbanizadora hipotecó la finca en garantía del crédito de los vendedores (en adelante hipoteca pequeña). Los vendedores también se comprometieron, en dicha escritura, a posponer esta garantía hipotecaria a favor de la que se constituiría a beneficio de la institución financiera que le prestara el dinero a la urbanizadora para desarrollar la finca. La cláusula de posposición dice lo siguiente:

> Es el propósito de la Compradora VILLA OLIMPIA DEVELOPMENT CORPORATION desarrollar y urbanizar los terrenos objeto de esta compraventa para lo cual han de obtener un préstamo de Continental Resources Corporation-P.R., or assignee, por una suma aún no determinada, para financiar la urbanización y la cons-

---

(¹) Las partes están de acuerdo en que la escritura de hipoteca a favor de los vendedores se inscribió el 14 de agosto de 1975 y la hipoteca a favor del banco el 15 de septiembre de ese año.

(²) Villa Olimpia Development Corp. posteriormente cambió de nombre a Bertelix Development Corporation. Además, en algún momento previo a abril de 1976, Yauco Homes Inc. acordó con Bertelix hacerse responsable de las todas las obligaciones de Bertelix frente al banco relacionadas con el financiamiento del proyecto de urbanización de la finca. En mayo de 1976, Yauco cumplió con este compromiso al obligarse frente al banco por todo el dinero que Bertelix adeudaba al banco. Cuando no sea necesario especificar a cuál desarrolladora nos referimos, las denominaremos genéricamente como "la urbanizadora".

trucción de unidades de vivienda en la misma, por lo que *los Vendedores* por la presente y desde ahora *postergan y subordinan la hipoteca aquí constituida, a favor de la que se constituya por* VILLA OLIMPIA DEVELOPMENT CORPORATION o sus sucesores en título o intereses, para desarrollar y urbanizar los terrenos *a favor de Continental Resources Corporation-P.R., or assignee,* siempre y cuando que el producido de dicho préstamo garantizado hipotecariamente, se use única y exclusivamente en el desarrollo de los terrenos objeto de esta compraventa.[3] (Énfasis suplido.) Apéndice, pág. 64.

El mismo día, cuando fue autorizada la escritura de compraventa e hipoteca pequeña, se autorizó también la escritura de hipoteca mediante la cual la urbanizadora garantizó un pagaré suscrito por ésta a favor de la Continental Resources Corporation-P.R. (en adelante la institución financiera) por la cantidad aproximada de 9.2 millones de dólares (en adelante hipoteca grande). Esta suma sería utilizada por la urbanizadora para desarrollar los terrenos. Posteriormente, la institución financiera endosó el pagaré para hacerlo pagadero al portador.

El 11 de marzo de 1974 se autorizó la Escritura Núm. 34 para enmendar la escritura de la hipoteca grande. En esta escritura comparecieron la urbanizadora, la institución financiera y el Banco Economías.[4] Se hizo constar que la urbanizadora había entregado al banco, en calidad de prenda, el pagaré garantizado por la hipoteca grande para así garantizar ciertos adelantos de dinero hechos por el banco a la urbanizadora. Además, se eliminó la fecha de vencimiento del pagaré, haciéndolo pagadero a la demanda. Para ajustarse al hecho de que el pagaré se había convertido en uno al portador, se enmendó la escritura de hipoteca grande, de modo que ya no estuviese consti-

---

[3] *Exhibit* Núm. 8-copia certificada de Escritura Núm. 89 autorizada por el notario Carlos M. Franco Soto el 18 de junio de 1973, pág. 16.

[4] Con posterioridad, este banco cambió de nombre a Banco Central Corp. Excepto cuando sea necesario, llamaremos "banco" a esta institución, independientemente del nombre que tuviera.

tuida a favor de la financiera ni estuviera sujeta al contrato de préstamo entre la financiera y la urbanizadora.

Aunque ambas escrituras de hipoteca se presentaron al Registro de la Propiedad simultáneamente, debido a asuntos no relacionados a la controversia en este caso, la hipoteca pequeña quedó inscrita con efectividad al 14 de agosto de 1975, mientras que la grande se inscribió el 15 de septiembre de ese año. Cuando el Registrador de la Propiedad inscribió la grande, anotó que lo hacía con rango de segunda mientras no se le presentara un acta aclaratoria de la intención de las partes.(⁵) Esta acta nunca se otorgó.

En 1982 el banco instó una demanda contra la urbanizadora y contra los vendedores. En su primera causa de acción, reclaman el importe de lo adeudado por la urbanizadora. La urbanizadora fue debidamente emplazada, pero al no contestar se le anotó la rebeldía. En su segunda causa de acción exigen que los vendedores cumplan con la obligación contractual contraída en la escritura de hipoteca pequeña, de posponer ésta a favor de la grande.

Por su parte, los vendedores presentaron una demanda de coparte contra la urbanizadora para reclamar la parte todavía adeudada del precio de compraventa de la finca y solicitar la ejecución de su hipoteca pequeña, si su crédito no es satisfecho de otro modo.

La urbanizadora fue debidamente emplazada y, al no comparecer, se le anotó la rebeldía. El tribunal de instancia dictó una sentencia en rebeldía en su contra, tanto respecto a la primera causa de acción del banco demandante, como respecto a la demanda contra coparte instada por los vendedores. Además, el tribunal declaró sin lugar la se-

---

(⁵) Según surge de la Solicitud de revisión, pág. 5, una nota del Registrador de la Propiedad dice:

"En su virtud, inscribo a favor de Continental Resources Corporation de Puerto Rico, or its order or assignee, su expresado derecho de hipoteca que adquiere sobre esta finca denegándose en cuanto al grado de primera hasta tanto no se ratifique la mención señalada en esta inscripción, aclarándose ...."

gunda causa de acción contra los vendedores y, como consecuencia, ordenó que se ejecutaran las hipotecas en el orden en que quedaron inscritas en el Registro de la Propiedad. De este dictamen recurre ante nos el banco.

## II

Ante nos el banco, que tiene en prenda el pagaré garantizado por la hipoteca grande, solicita que ordenemos a los vendedores el cumplimiento específico de la cláusula de posposición de hipoteca contenida en la escritura de hipoteca pequeña. Alega que dicha cláusula fue una disposición a favor de tercero de la cual el banco, como beneficiario, puede aprovecharse sin necesidad de contar con la urbanizadora. Sostiene que es el beneficiario de un contrato a favor de tercero, en el cual la urbanizadora fue la parte estipulante y los vendedores la parte promitente u obligada. Los vendedores niegan que el contrato sea en beneficio de tercero.

Como regla general, los contratos sólo afectan las partes involucradas en éste. Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374. Sin embargo, debe tenerse en cuenta que "el contrato como fenómeno que penetra y que se instala en la realidad jurídica no es jamás algo absolutamente indiferente para los terceros". L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 265. Véase, en general, íd., págs. 264-269. El Art. 1209 del Código Civil, *supra,* consigna que los contratos pueden tener estipulaciones a favor de tercero y que el tercero podrá exigir su cumplimiento siempre que hubiese hecho saber su aceptación al obligado antes de que la estipulación haya sido revocada. *A.L. Arsuaga v. La Hood Const., Inc.*, 90 D.P.R. 104, 109 (1964). Este tipo de contrato es celebrado entre el promitente —obligado por la disposición— y el estipulante, quienes otorgan alguna ventaja al tercero beneficiario con el efecto de convertirlo en

acreedor directo del obligado en cuanto a la prestación prometida. J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. 1, págs. 274–276. En el contrato a favor de tercero, la intención de los contratantes es conceder al beneficiario el derecho a reclamar judicialmente el cumplimiento de lo establecido. Puig Brutau, *op. cit.*, pág. 262. Sin embargo, no constituyen una estipulación a favor de tercero —de las dispuestas por el Art. 1209 del Código Civil, *supra*— aquellos contratos que "las partes celebran teniendo en cuenta el interés de una tercera persona y que proporcionan a dicha persona directa o indirectamente una ventaja cualquiera o un beneficio". Díez-Picazo, *op. cit.*, pág. 269.

■ Los contratos a favor de tercero "son únicamente aquellos que las partes celebran para atribuir de manera directa o indirecta un derecho a un tercero, que, sin embargo, no ha tenido participación ni directa ni indirecta en la celebración del negocio y que no queda por consiguiente obligado ni vinculado por él". Díez-Picazo, *op. cit.*, pág. 269. Véanse, también, íd., págs. 269–271, y Puig Brutau, *op. cit.*, pág. 262. Es necesario que se le haya querido atribuir al tercero el derecho de reclamar el cumplimiento de la promesa. Díez-Picazo, *op. cit.*, pág. 270; Puig Brutau, *op. cit.*, pág. 262.

"La razón de ser de la estipulación en favor o en beneficio del tercero radica en la existencia de un interés del estipulante en que el pacto sea establecido y en que la promesa sea cumplida para el beneficiario". Díez-Picazo, *op. cit.*, pág. 274. Este interés es la causa de la estipulación, y no necesariamente tiene que ser de índole económico. Íd. "El estipulante puede celebrar el contrato en favor del tercero para hacerle una liberalidad (causa donandi), para cumplir con una obligación preexistente (causa solvendi) o con el fin de recibir de él una contraprestación (causa credendi)." Íd., pág. 276. Por lo tanto, la causa puede ser un convenio por celebrarse entre el tercero y el estipulante.

Puig Brutau, *op. cit.*, pág. 275. Es debido a la naturaleza del interés del estipulante que éste también está legitimado para exigir al promitente el cumplimiento de la prestación convenida en favor del tercero. L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 6ta ed., Madrid, Ed. Tecnos, 1989, Vol. II, pág. 96; J. Castán Tobeñas, *Derecho Civil español, común y foral*, 16ta ed., Madrid, Ed. Reus, 1992, T. 3, pág. 755.

■    No es necesario que el tercero acepte para que adquiera el derecho estipulado a su favor. Díez-Picazo, *op. cit.*, págs. 274–275; Castán Tobeñas, *op. cit.*, pág. 753. El tercero adquiere el derecho antes de la aceptación. La aceptación por el tercero es sólo pertinente en cuanto impide que posteriormente se revoque la estipulación a su favor. Díez-Picazo, *op. cit.*, pág. 275.

■    Como regla general, el estipulante es quien tiene la única facultad de revocar la disposición en beneficio del tercero. F. Puig Peña, *Tratado de Derecho Civil Español*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1973, T. IV, Vol. II, pág. 82. Mientras el beneficiario no haya aceptado, hay que entender que el estipulante tiene el derecho a revocar la estipulación. Castán Tobeñas, *op. cit.*, pág. 755.

■    Esta aceptación "puede ser expresa o tácita, por palabras o por hechos". Q.M. Scaevola, *Código Civil Comentado*, 2da ed., Madrid, Ed. Reus, 1958, T. XX, pág. 630. Es necesario, para que se complete la aceptación, poner en conocimiento de ella al obligado. Se ha sostenido además que es necesario notificar también al estipulante, debido a que éste es quien tiene la facultad de revocar la estipulación y quien, por lo tanto, se ve afectado por el acto de aceptación.([6])

---

([6]) L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 275, expone que debe notificarse al estipulante en cuanto la aceptación opera como un límite del poder de revocación de la estipulación. J. Puig Brutau, *Fundamentos del Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. 1, págs. 273–274, coincide en que el tercero debe hacer saber su aceptación al

██ Para considerar si este contrato es a favor de tercero, primero es necesario examinar si el banco puede ser considerado como el beneficiario de la estipulación. Mediante la cláusula en la escritura de hipoteca pequeña, los vendedores se comprometieron, frente a urbanizadora, a postergar y subordinar su hipoteca "a favor de la que se constituya por [la urbanizadora] ... a favor de Continental Resources Corporation-P.R. [la institución financiera] or assignee". Solicitud de revisión, pág. 9. Aunque la estipulación no hace referencia al banco, "[n]o es necesario que el tercero esté individualizado en el momento de la conclusión del contrato, bastando con su determinabilidad, es decir, que existan en la disposición contractual elementos suficientes para poder determinarlo con posterioridad". J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, pág. 429.

En el caso ante nos, la hipoteca grande se constituyó a favor de la institución financiera, resultando la beneficiaria inicial de la estipulación. Posteriormente la hipoteca se modificó para que su acreedor fuera el portador del pagaré garantizado. Cuando el banco obtiene dicho pagaré al portador, como prenda garantizadora de su acreencia frente a la urbanizadora, se convirtió en el tercero beneficiario de la estipulación. Esto es así porque la estipulación permite que el tercero sea un sucesor (*assignee*) de la institución financiera y además porque el banco, al tener en prenda el pagaré, puede "ejercitar las acciones que competan al dueño de la cosa pignorada para reclamarla o defenderla contra tercero". Art. 1768 del Código Civil, 31 L.P.R.A. sec. 5027.

██ La determinación de si la estipulación da al tercero derecho a reclamar la ejecución de lo prometido es una cuestión de hecho. Manresa, *op. cit.*, pág. 432. Toda la

---

que estipuló en su favor.

prueba en el caso ante nos consiste de documentos someti-
dos mediante estipulación, por lo que estamos en la misma
posición que el tribunal de instancia para evaluarla.

La naturaleza del negocio aquí realizado y el texto de la
cláusula contractual nos convence de que la intención de
los contratantes fue otorgar al banco el derecho a exigir
directamente a los vendedores la posposición de la hipoteca
pequeña. La cláusula obliga a los vendedores a postergar y
subordinar su hipoteca a favor de la que se constituyera "a
favor de Continental Resources Corporation-P.R. [la insti-
tución financiera] or assignee". Solicitud de revisión, pág.
5. Esta disposición otorga, con claridad, un derecho al ter-
cero de reclamar su cumplimiento.

En caso contrario, tendría que afirmarse que el exigir la
posposición a los vendedores queda en manos de la
urbanizadora. Esto no concuerda con la naturaleza del ne-
gocio realizado debido a que ambas escrituras de hipoteca
se autorizaron el mismo día, por lo que luego de satisfacer
el interés de urbanizadora, no era de esperarse que fueran
diligentes en gestionar la posposición a favor del banco.

Finalmente, los vendedores tenían que saber que se ha-
bían obligado a posponer su hipoteca y que, por los propios
términos del contrato, dicha posposición podría ser exigida
por el banco, parte directamente beneficiada por la dispo-
sición contractual.

Además, en casos más dudosos, se ha considerado que
existe una estipulación en favor de tercero. Se ha resuelto
que cuando A presta a B, conviniendo que B le devolvería el
dinero a un tercero, fue la intención de las partes otorgar
al tercero un derecho a reclamar directamente a B lo
debido. Puig Brutau, *op. cit.*, págs. 263–264.

Por todo lo anterior, concluimos que la obligación de pos-
posición de hipoteca es exigible por el banco directamente
contra los vendedores. No existen hechos de los cuales se

puede concluir que la urbanizadora haya revocado la estipulación.([7])

## III

■ Finalmente, los vendedores sostienen que no tienen que cumplir con la obligación de posponer su hipoteca porque la urbanizadora no cumplió con la obligación de pagarles el precio de compraventa de la finca. Invocan el Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052, el cual establece el derecho a resolver las obligaciones recíprocas cuando uno de los obligados no cumpla lo que le incumbe. Los vendedores argumentan que debido a que la urbanizadora no les ha pagado el precio de venta, ahora no se les puede exigir que cumplan con su obligación de posponer la hipoteca. Los vendedores no tienen razón.

■ La naturaleza del pacto en este caso impide que se aplique la regla general antedicha. No puede entenderse que el cumplimiento por los vendedores de la cláusula de posposición está sujeto a la condición resolutoria tácita de la falta de pago por la urbanizadora de la deuda garantizada. Sencillamente sería absurdo afirmar que los vendedores se obligaron a subordinar la garantía de su acreencia, pero que si ésta no se le paga, entonces su obligación de subordinar quedaría resuelta. Precisamente el riesgo de esta cláusula surge cuando no se le paga al vendedor: como consecuencia de la cláusula, éste tendrá su

---

([7]) Hubo prueba documental, consistente en la declaración del esposo de una de las vendedoras, de que el 13 de abril de 1976, cuando se autorizó la Escritura Núm. 218 sobre poder especial (a la cual comparecieron el banco, la urbanizadora y los vendedores), representantes autorizados del banco y de la urbanizadora le hicieron creer a los vendedores que proveerían los fondos suficientes para garantizar el pago de la acreencia de los vendedores. Independientemente de si esto podría constituir una revocación por la urbanizadora de la estipulación en favor del banco y de si ya anteriormente el banco había aceptado la estipulación, haciéndola irrevocable, lo cierto es que nos parece más creíble el testimonio del notario que autorizó la escritura, quien declaró que dichas representaciones no se hicieron y cuya declaración en general contradice directamente lo aseverado por el esposo de una de las vendedoras.

garantía, pero subordinada. Si fuera de otra manera, el vendedor no se estaría obligando a nada: le pagan o, en caso contrario, su garantía quedaría en primera. Concluimos, por lo tanto, que debido a la naturaleza particular de esta cláusula, no aplica la defensa de la condición resolutoria tácita respecto a la contraprestación de pagar de la deuda principal.(8)

Debido a que la cláusula de posposición de hipoteca es una estipulación en favor de tercero que le permite al banco reclamar su cumplimiento frente a los vendedores, erró el tribunal de instancia al declarar sin lugar la segunda causa de acción del banco demandante en la que exigía dicha posposición.

*Se dictará sentencia de conformidad con estos pronunciamientos.*

El Juez Asociado Señor Negrón García emitió una opinión disidente.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

La adjudicación recta de este recurso exige más que la doctrina de contrato en beneficio de tercero. Expongamos los hechos según surgen de los múltiples negocios realizados.

I

José A. Olivari Antongiorgi y María L. Olivari Antongiorgi eran los dueños de cinco (5) propiedades que Villa Olimpia Development Corp. (en adelante Villa Olimpia) in-

---

(8) No tenemos que expresarnos sobre la aplicabilidad en general de esta defensa, cuando el obligado por una estipulación en favor de tercero la invoque frente a éste, por razón del incumplimiento del estipulante de la obligación que tenía frente al promitente.

teresaba adquirir para construir unas viviendas. Para ello, el 18 de junio de 1973 suscribieron la Escritura Núm. 89 de venta, agrupación e hipoteca ante el notario público Carlos M. Franco Soto. La hipoteca sobre la totalidad del terreno era la garantía que Villa Olimpia suscribió a favor de los vendedores Olivari Antongiorgi por el balance impagado del precio, en virtud de dos (2) pagarés por $147,849.28 y $153,583.23, respectivamente, que debían satisfacerse en cuatro (4) plazos anuales comenzando en junio de 1974. Dado el interés de Villa Olimpia de desarrollar la propiedad, pactaron específicamente en la escritura:

> Es el propósito de la compradora VILLA OLIMPIA DEVELO-PMENT CORPORATION desarrollar y urbanizar los terrenos objeto de esta compraventa para lo cual han de obtener un préstamo de Continental Resources Corporation-P.R., or assignee, por una suma aún no determinada, para financiar la urbanización y la construcción de unidades de vivienda en la misma, por lo que los Vendedores por la presente y desde ahora postergan y subordinan la hipoteca aquí constituida, a favor de la que se constituya por VILLA OLIMPIA DEVELOPMENT CORPORATION o sus sucesores en título o intereses, para desarrollar y urbanizar los terrenos a favor de la Continental Resources Corporation-P.R., or assignee, siempre y cuando que el producido de dicho préstamo garantizado hipotecariamente, se use única y exclusivamente en el desarrollo de los terrenos objeto de esta compraventa. Apéndice, pág. 64.

Ese mismo día, Villa Olimpia otorgó la Escritura Núm. 116 ante el notario público Manuel Correa Calzada, constituyendo una hipoteca a favor de Continental Resources Corporation-P.R. (en adelante Continental) por $9,201,600. Como garantía, Villa Olimpia suscribió un pagaré hipotecario a favor de Continental, vencedero el 30 de junio de 1976.

El 11 de marzo de 1974, Villa Olimpia —quien había cambiado su nombre corporativo a Bertelix Development Corporation— junto con Continental y el Banco Central y Economías (en adelante el banco), otorgaron la Escritura Núm. 34 ante el notario público Herman Cestero Rodrí-

guez con el propósito de enmendar la Escritura Núm. 116 y su pagaré hipotecario, el cual se hizo pagadero a su presentación o demanda. En esa escritura se eliminó que era a favor de Continental y, también, la cláusula que especificaba que el dinero de la hipoteca se prestaba para el desarrollo y construcción del terreno. Surge que el Banco participó como tenedor del pagaré hipotecario en calidad de prenda, en garantía de un adelanto de dinero que hiciera a Bertelix.

El 23 de julio de 1974, Bertelix y el Banco celebraron un contrato de prenda y préstamo, en el cual éste proveería el financiamiento para la construcción del proyecto hasta la suma agregada de $6,038,865, sin que en momento alguno el principal prestado excediese de $3,818,690. A cambio, el Banco recibió el pagaré garantizado por la hipoteca incluida en la Escritura Núm. 116, en calidad de prenda.

El 29 de julio de 1974 el Registrador de la Propiedad de San Germán suspendió la inscripción de la Escritura Núm. 89 original por no haberse dividido el precio de venta entre las fincas agrupadas; ello provocó que la Escritura Núm. 116 tampoco se inscribiera.

El 1ro de agosto de 1975, el licenciado Franco Soto recogió las escrituras, subsanó el defecto y las presentó nuevamente. La Escritura Núm. 89 quedó inscrita el 14 de agosto de 1975 y la Escritura Núm. 116 el 15 de septiembre de 1975, con la nota del Registrador de la Propiedad siguiente:

> En su virtud, inscribo a favor de Continental Resources Corporation de Puerto Rico, or its order or assignee, su expresado derecho de hipoteca que adquiere sobre esta finca denegándose en cuanto al grado de primera hasta tanto no se ratifique la mención señalada en esta inscripción, aclarándose .... Solicitud de revisión, pág. 5.

La mención al margen de la inscripción de la Escritura Núm. 116 dispone: "Acta aclaratoria y ratificación de los titulares y la Continental Resources y se defina bien, que

una es primera y la otra, segunda." Solicitud de revisión, pág. 5 esc. 5.

Así las cosas, inexplicablemente San Juan Abstract Company, Inc. realizó a solicitud del Banco un estudio de título de 5 de abril de 1976, en el cual señaló que la "hipoteca [incluida en la Escritura Núm. 116] tiene rango de *primera*, por haberse postergado en su beneficio la que se señalará bajo el número 3 de [e]ste epígrafe de gravámenes [en Escritura Núm. 89] ...". (Énfasis en el original.) Apéndice, pág. 180.

El 12 de abril de 1976, Yauco Homes adquirió la propiedad mediante la Escritura Núm. 214 otorgada ante el notario público Baldomero Collazo Salazar.

El 13 de abril de 1976, los Olivari Antongiorgi, acreedores de la hipoteca incluida en la Escritura Núm. 89, Yauco y el Banco otorgaron ante el notario público Baldomero Collazo Salazar la Escritura Núm. 218 de Poder Especial. En ella, los Olivari Antongiorgi y Yauco modificaron la fecha de vencimiento de los pagarés a que los Olivari tenían acreencia. Convinieron también en liberar los solares y casas gravados con dicha hipoteca para facilitar su venta. En consideración, el Banco les remitiría el pago de mil sesenta dólares ($1,060) por unidad liberada. Para ello otorgaron un Poder irrevocable al Banco para autorizarlo a hacer las liberaciones. Nada se hizo constar sobre la posposición de la hipoteca inscrita a favor de los Olivari Antongiorgi.

El 3 de mayo de 1976, Bertelix, Yauco y el Banco suscribieron un contrato complementario modificando el de prenda y préstamo que Bertelix y el Banco celebraron el 23 de julio de 1974. Yauco asumió y se responsabilizó solidariamente con Bertelix por el préstamo concedido hasta el momento y extendió el contrato de prenda a favor del Banco. El Banco aumentó el financiamiento a $8,890,048.12 para la construcción de ciento noventa y ocho (198) unidades de vivienda.

El 1ro de mayo de 1977, Yauco y el Banco suscribieron un segundo contrato complementario en el cual se redujo el número de unidades a construirse de ciento noventa y ocho (198) a ochenta y tres (83). El Banco aumentó en $1,583,767.43 el financiamiento adelantado para el desarrollo.

El 7 de diciembre de 1978, Yauco y el Banco otorgaron la Escritura Núm. 59 ante el notario público Noel González Miranda mediante la cual Yauco entregó veintiséis (26) unidades de vivienda como Dación en Pago Parcial al Banco por la cifra de $799,279.33 de los $4,400,000 que le debía en principal. El Banco liberó esas propiedades de la hipoteca constituida a su favor.

El Banco, el 31 de mayo de 1979, envió una carta a los Olivari Antongiorgi informando que, conforme al poder que se le otorgó, liberó dieciséis (16) solares segregados de la finca hipotecada. Incluyó cheque a estos efectos por la cantidad de ocho mil ochocientos cuarenta dólares ($8,480). Renunció como apoderado de los Olivari Antongiorgi al decidir no proveer financiamiento adicional al proyecto.

Al Yauco no haber cumplido con el repago del préstamo de construcción, el Banco declaró vencido y exigible el balance impagado. Demandó a Yauco en ejecución de hipoteca. Demandó también a los Olivari Antongiorgi exigiéndoles que subrogaran su hipoteca a la existente a favor de Continental.

El Tribunal Superior, Sala de Ponce (Hon. Felipe Ortiz Ortiz, Juez) declaró con lugar la demanda instada contra Yauco; no así la acción contra los Olivari Antongiorgi. De dicha sentencia recurrió el Banco y hoy este Foro revoca. *Disentimos.*

## II

Sabido es que para que una hipoteca esté debidamente constituida es requisito que conste en una escritura pública y se inscriba en el Registro de la Propiedad. Art. 188 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2607; *Martínez v. Colón Franco, Concepción*, 125 D.P.R. 15 (1989); *Rosario Pérez v. Registrador*, 115 D.P.R. 491, 493 (1984). Su rango se determina por estricto orden de presentación conforme la norma de primero en tiempo, primero en derecho. La excepción a esta norma es cuando las partes expresamente convienen un orden distinto. Para ello es necesario el consentimiento de los acreedores hipotecarios existentes al momento de convenir la alteración del rango.[1] De igual manera se presume que los derechos registrados existen y pertenecen a su titular en la forma determinada por el asiento respectivo. 30 L.P.R.A. sec. 2354. Los asientos —así como los actos inscritos— deben estimarse válidos hasta tanto los tribunales declaren su nulidad. *Consejo Tit. C. Parkside v. MGIC Fin. Corp.*, 128 D.P.R. 538 (1991).

La calificación efectuada por el Registrador de la Propiedad no tiene el propósito de declarar la existencia o inexistencia de un derecho dudoso o controvertido entre partes contendientes. R.M. Roca Sastre, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosch, 1979, T. II, pág. 265; *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76 (1992). *Cabassa v. Registrador*, 116 D.P.R. 861, 864 (1986). Dichos derechos tendrán que dilucidarse mediante acción judicial ordinaria, correspondiendo a la parte que impugna el contenido del Registro de la Propiedad el peso de rebatir la presunción de corrección que le afecta.

---

[1] Bajo la Ley Hipotecaria y del Registro de la Propiedad de 1979 se especificaron los requisitos para la permuta o posposición de rango de hipoteca. Véase 30 L.P.R.A. sec. 2608. La antigua Ley Hipotecaria, vigente al otorgarse la Escritura Núm. 89, no regulaba la permuta o posposición de rango, por lo que se regía por el Código Civil.

## III

En el caso de autos, debemos determinar si el Banco puede requerir que se subordine el rango de la hipoteca a favor de los Olivari Antongiorgi a la suya, a la luz de las negociaciones realizadas para el desarrollo del proyecto. El remedio que solicita el Banco es exigible sólo mediante acción ordinaria para demostrar la existencia del acuerdo y que sus actuaciones, con posterioridad a la denegatoria, no reflejan su conformidad con la calificación del Registrador de la Propiedad.

De las actuaciones del Banco, luego de la calificación del Registrador de la Propiedad, se desprende su conocimiento(²) y conformidad de que la hipoteca a su favor tenía rango de segunda.

La prueba presentada por el Banco para sostener la obligación de los Olivari Antongiorgi de postergar su hipoteca consistió en la escritura de venta, agrupación e hipoteca (Escritura Núm. 89) otorgada por los Olivari Antongiorgi y Villa Olimpia. Ese documento incluyó la cláusula de postergación en la cual el Banco se ampara.

Es importante destacar que los Olivari Antongiorgi *no se comprometieron a postergar eventualmente su acreencia*. Hicieron la postergación expresamente a partir de la fecha del otorgamiento de la escritura. La suspensión del Registrador de la Propiedad en inscribirla fue lo que motivó que la postergación no se hiciera efectiva. La negativa del Registrador a reconocer la posposición de la hipoteca pudo haberse remediado mediante recurso gubernativo ante este Foro(³) o sometiendo un acta aclaratoria y ratificación

---

(²) Al ser público el Registro de la Propiedad para quienes tengan interés en averiguar el estado jurídico de los bienes inmuebles o derechos reales inscritos, se imputa por ficción legal el conocimiento de la constancia registral. *García Larrinua v. Lichtig*, 118 D.P.R. 120, 137 (1986). El que el Banco confiara en el estudio de título realizado por una compañía privada podría dar margen a una reclamación contra ésta, más no tiene repercusión respecto al contenido del Registro de la Propiedad.

(³) El recurso gubernativo hubiese sido a los efectos de determinar si a base de los documentos presentados para su inscripción era necesaria la ratificación de los

de los titulares de acuerdo con la mención al margen de la inscripción. Al momento de la presentación de la demanda ambas alternativas habían caducado.

Al otorgarse ante el notario público Baldomero Collazo Salazar la Escritura Núm. 218 de Poder Especial, el 13 de abril de 1976, la deuda del desarrollador Yauco Homes con los Olivari Antongiorgi estaba vencida y exigible mediante la ejecución de la hipoteca que tenían a su favor. El Banco se comprometió a remitir la suma de mil sesenta dólares ($1,060) por cada liberación realizada conforme al poder concedídole, a la vez que consiguió que se modificara la fecha de vencimiento de los pagarés de los Olivari Antongiorgi y *evitó así la ejecución de la hipoteca que los garantizaba.* Es evidente que la intención de las partes al otorgar este contrato era saldar lo adeudado a los Olivari Antongiorgi sin tener que recurrir a la ejecución de la hipoteca. Del Banco entender que tenía una acreencia hipotecaria de mejor rango que la de los Olivari Antongiorgi, no era menester llegar a este tipo de acuerdo, pues su acreencia hubiese estado debidamente protegida. La modificación de la fecha del vencimiento demuestra el conocimiento, por parte del Banco, que su hipoteca tenía rango de segunda. Si la hipoteca a favor de los Olivari Antongiorgi hubiese sido segunda en rango, la modificación de la fecha de vencimiento hubiese sido innecesaria, pues aunque vencida la obligación, no hubiesen podido cobrar su acreencia al encontrarse tras una primera hipoteca de $9,201,600.

Como puede apreciarse, desde que se otorgó la escritura de Poder Especial, el Banco incurrió en una obligación personal frente a los Olivari Antongiorgi. El pago de mil sesenta dólares ($1,060) por liberación realizada tenía el propósito de garantizar el pago de su acreencia.

Es necesario señalar que al momento de otorgarse el

---

titulares; no para declarar la existencia de un derecho.

Poder se estimaba que el proyecto constaría con alrededor de doscientas (200) unidades de vivienda. Prueba de esto es el segundo contrato complementario celebrado el 1ro de marzo de 1977 en el que Yauco y el Banco, *sin el consentimiento de los Olivari Antongiorgi*, redujeron el número de unidades a construirse de ciento noventa y ocho (198) a ochenta y tres (83). Evidentemente, la cuantía que recibirían los Olivari Antongiorgi por las liberaciones quedaría sustancialmente reducida con este cambio. Para ello era necesario su consentimiento, pues con cada liberación disminuía su garantía.

El Banco no puede compeler a los Olivari Antongiorgi a postergar el rango de su hipoteca cuando resulta meridianamente claro que antes de otorgarse la escritura de Poder Especial sabía que su rango era inferior al de éstos. Los Olivari Antongiorgi accedieron a la propuesta que le hiciera el Banco para no tener que llegar a ejecutar su hipoteca confiando en que el Banco saldaría su acreencia. El Banco no sólo incumplió con la obligación asumida al concedérsele el poder irrevocable, sino que también menoscabó la garantía de los Olivari Antongiorgi. Los actos realizados por el propio Banco le impiden obligar a los Olivari Antongiorgi a postergar su rango hipotecario. *Meléndez Piñero v. Levitt & Sons of P.R.*, 129 D.P.R. 521 (1991); *Int. General Electric v. Concrete Builders*, 104 D.P.R. 871, 878 (1976). Hacerlo es una injusticia; confirmaríamos.