Sixto Cotto Morales y otros, demandantes y recurridos, *v.* Calo Ríos y otros, demandados y recurrentes.

*Número:* RE-94-258       *Resuelto:* 17 de abril de 1996

*Yolanda V. Toyos Olascoaga*, de *Totti, Rodríguez-Díaz & Fuentes*, abogada de la parte recurrente; *Paul Vilaró Nelms* y *José Antonio López Rodríguez*, abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR CORRADA DEL RÍO emitió la opinión del Tribunal.

"La más sagrada, la más inatacable, la más personal de todas las propiedades es la obra fruto del pensamiento ...."[1]

---

[1] D. Espín Cánovas, *Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, Vol. II, 1925, pág. 302.

El caso de autos nos brinda la oportunidad de expresarnos por primera vez acerca del alcance de la Ley de Propiedad Intelectual[2] y la concesión de daños al amparo de dicho estatuto.

Los hechos fundamentales que dan lugar al presente recurso de revisión se resumen a continuación.

## I

Como parte de las actividades promocionales realizadas por los demandados recurrentes para anunciar los productos SONY en Puerto Rico, durante las Navidades de 1989 se preparó y publicó un catálogo en el que además de incluir los productos electrónicos de la demandada recurrente se incluyeron en el diseño gráfico de este catálogo las fotografías de unas diecinueve (19) obras artísticas de autores puertorriqueños.

Uno de estos autores fue el aquí demandante recurrido, Sr. Sixto Cotto, cuya obra serigráfica, "De Fiesta en la Calle", aparece en las páginas veinte (20) y veintiocho (28) del catálogo.[3]

El 21 de diciembre de 1990 se presentó una demanda sobre "violación al derecho moral del autor y daños". En ésta, los aquí demandantes recurridos alegaron que los aquí demandados recurrentes, con el propósito de promocionar sus productos, habían publicado y mutilado sin su autorización una obra de su autoría. Reclamaron la suma de ciento cuarenta mil dólares ($140,000) en concepto de los daños alegadamente causados por las acciones de los demandados recurrentes.[4]

---

[2] Ley Núm. 96 de 15 de julio de 1988 (31 L.P.R.A. sec. 1401 *et seq.*).

[3] Véase Alegato de los recurrentes, Apéndice, págs. 20 y 28.

[4] La parte demandada recurrente en este caso la componen el Sr. Calo Ríos, su esposa, María de Ríos, ambos por sí y en representación de la sociedad legal de gananciales constituida por ambos; Wonderman Worldwide, Inc. y Sony de Puerto Rico, Inc.

La demanda fue oportunamente contestada por los demandados recurrentes quienes negaron los hechos alegados en la demanda, pero admitieron que no se solicitó permiso del señor Cotto para la publicación, ya que la obra publicada era propiedad del codemandado Sr. Calo Ríos.[5] Además, negaron que hubiera ocurrido mutilación alguna a la obra. Como defensas afirmativas se planteó la falta de jurisdicción del tribunal de instancia para entender en una reclamación de derechos patrimoniales debido a la doctrina de campo ocupado, entre otras.

El 23 de septiembre de 1992 los demandados recurrentes presentaron una Moción de Desestimación y/o Sentencia Sumaria. En ésta solicitaron del tribunal a quo la desestimación o sentencia sumaria —o ambas cosas— a su favor, debido a la falta de jurisdicción del tribunal de instancia para entender en los derechos patrimoniales reclamados por los demandantes recurridos, entre éstos la reclamación sobre propiedad, divulgación y reproducción de la obra, cuya jurisdicción es exclusiva del foro federal. Por otro lado, también plantearon en dicha moción que el tribunal carecía de jurisdicción sobre la reclamación de derechos morales de autor, toda vez que no se había cumplido con el requisito de la Ley de Propiedad Intelectual sobre la inscripción de la obra. Los demandantes recurridos se opusieron a la Moción de sentencia sumaria mediante Moción de 23 de octubre de 1992. El tribunal de instancia acogió la solicitud de los demandados recurrentes y dictó sentencia parcial el 24 de febrero de 1993. En ésta desestimó la reclamación de daños patrimoniales de la parte demandante recurrida por carecer de jurisdicción para entender en ella.

En cuanto al requisito de inscripción de la obra, el tribunal de instancia entendió que no era necesaria su inscripción en el Registro de Propiedad Intelectual para tener

___

[5] Según surge del informe pericial que obra en autos y que fuera preparado por el Sr. Jesús M. Díaz Caraballo, tasador de obras de arte, la serigrafía "De Fiesta en la Calle" tuvo una edición consistente en doscientos cincuenta (250) ejemplares seriados y quince (15) pruebas de artista.

derecho a la protección del derecho moral. Además, el tribunal de instancia expresó que lo que restaba por determinar en el caso era la violación de derecho moral de autor, si alguna, y el valor de dicha acción. La referida sentencia parcial advino final y firme al no recurrirse en alzada sobre sus disposiciones.

El 14 de marzo de 1994 los demandados recurrentes presentaron una nueva moción de sentencia sumaria basada en la ausencia de daños de la naturaleza de los que requiere un caso de violación de derechos morales. Alegaron que la ausencia de tales daños surgía con diáfana claridad de las propias deposiciones de los demandantes recurridos y del informe de su perito. También se trajo a la atención del tribunal a quo el hecho de que la alegada mutilación de la obra tampoco cumplía con los criterios de la doctrina del derecho moral, toda vez que lo que era objeto de la reclamación era una *fotografía* y no una obra como tal. Dicha moción fue declarada sin lugar el 23 de marzo de 1994; posteriormente no se recurrió en alzada de lo allí resuelto.

El 15 de abril de 1994, inmediatamente luego de concluir la presentación de la prueba, el tribunal de instancia dictó sentencia. En ella se determinó que la serigrafía titulada "De Fiesta en la Calle" había sido mutilada, que había sido publicada sin autorización[6] y que los codemandados habían sido temerarios. En consecuencia, el tribunal de instancia dictó sentencia a favor de los demandantes recurridos y les concedió la suma de dieciocho mil dólares ($18,000) como compensación global por los daños sufridos, así como las costas del pleito. Además, tras concluir que los demandados recurrentes habían actuado de manera temeraria, les impuso el pago de tres mil dólares ($3,000) en concepto de honorarios de abogado.

---

[6] El tribunal de instancia en su Sentencia parcial de 24 de febrero de 1993 ya había adjudicado el reclamo sobre la publicación sin autorización determinando que éste implicaba reclamo de derechos patrimoniales sobre cuyo reclamo el tribunal no tenía jurisdicción.

Inconforme con la determinación del tribunal de instancia, la parte demandada recurrente presenta ante nos el presente recurso de revisión. En éste alegó la comisión de cuatro (4) errores por parte del tribunal a quo, a saber:

a. El tribunal de instancia carecía de jurisdicción para determinar sobre derechos patrimoniales de autor.
b. La serigrafía "De Fiesta en la Calle" no fue mutilada.
c. El tribunal de instancia abusó de su discreción al determinar que los codemandados recurrentes incurrieron en temeridad.
d. No procede la imposición de daños del tribunal de instancia.

Habiéndose presentado los alegatos de las partes, estamos en posición de resolver las controversias planteadas ante nos y procedemos a así hacerlo.

## II

Los derechos de autores, artistas, compositores, cineastas y demás integrantes de la comunidad intelectual de Puerto Rico están fundamentalmente protegidos por dos (2) piezas legislativas: la *"Federal Copyright Act"*, 17 U.S.C. sec. 101 *et seq.*, y la Ley de Propiedad Intelectual, *supra.* Además, y conforme resolviéramos en *Reynal v. Tribunal Superior*, 102 D.P.R. 260, 262–263 (1974), aplican de manera supletoria a cualquier controversia sobre propiedad intelectual las disposiciones del Código Civil de Puerto Rico que no sean incompatibles con la legislación federal sobre esta materia.[7]

La *propiedad intelectual* se define como "el conjunto de derechos que la ley reconoce al autor sobre las obras que ha producido con su inteligencia, en especial los de que su paternidad le sea reconocida y respetada, así como que se

---

[7] Véase Exposición de Motivos de la Ley Núm. 96, *supra,* 1988 Leyes de Puerto Rico, pág. 428.

le permita difundir la obra, autorizando o negando, en su caso, la reproducción".[8]

■ En Puerto Rico la propiedad intelectual o los derechos de autor está formada por la imbricación de dos (2) derechos de naturaleza diferente: el derecho moral, que de manera primordial protege el vínculo personal entre el autor y su obra y el derecho patrimonial que consiste en el monopolio de la explotación de la obra.

En su primer señalamiento de error, la parte demandada recurrente aduce, en síntesis, que el tribunal de instancia carecía de jurisdicción para determinar sobre derechos patrimoniales de autor por competirle esta determinación al foro federal. Veamos.

■ La doctrina de "campo ocupado" tiene su génesis en la cláusula de supremacía de la Constitución Federal,[9] en la que se dispone que la ley federal tendrá supremacía sobre las leyes estatales. Sin embargo, el Tribunal Supremo federal ha resuelto que la delegación de poderes bajo los cuales el Congreso aprobó la *Federal Copyright Act* no son exclusivos y, por ende, de darse las condiciones adecuadas, las leyes estatales pueden coexistir con las federales en el área de los derechos de autor.[10] Tal visión tiene su fundamento en que la apreciación de los logros intelectuales varían de estado a estado, dado el hecho de la gran diversidad de intereses que forman la Nación americana.[11] No obstante, se pueden suscitar situaciones en las que un estatuto federal no pueda coexistir con un estatuto estatal, en cuyo caso, la ley estatal puede invalidarse siguiendo varias alternativas. Primero, el Congreso puede declarar su intención específica de "ocupar el campo"

[8] J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, T. III, 1973, págs. 200–201.

[9] Art. VI, Cl. 2, Const. EE. UU., L.P.R.A., Tomo 1.

[10] *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 478 (1974); *Goldstein v. California*, 412 U.S. 546 (1973).

[11] *Kewanee Oil Co. v. Bicron Corp.*, supra, pág. 479.

en un área particular a reglamentarse. Segundo, de no haber una declaración expresa por parte del Congreso, se puede ocupar el campo si la reglamentación federal es tan abarcadora que no cabe duda que la intención federal era reglamentar la totalidad del área y no es posible ninguna otra reglamentación estatal. Finalmente, una ley *estatal* puede ser invalidada si conflige directamente con un estatuto federal.([12])

Resolvimos en *Bordas & Co. v. Srio. de Agricultura*, 87 D.P.R. 534, 552–553 (1963), que "[n]o se presumirá que la reglamentación federal sustituye a la reglamentación estatal por el hecho de que el Congreso reglamente un área en forma limitada. Para que así sea es necesario que la ley del Congreso interpretada razonablemente esté en conflicto real con la ley del estado. En ausencia de una prohibición específica en la ley federal contra una ley local, la legislación insular que complementa la ley federal es válida siempre y cuando que la primera no esté sustancialmente en conflicto con la segunda". (Citas omitidas.)

En *Pancorbo v. Wometco de P.R., Inc.*, 115 D.P.R. 495 (1984), resolvimos específicamente el primer planteamiento de error al que hacen referencia los demandados recurrentes. Resolvimos en esa ocasión que en nuestra jurisdicción la *Federal Copyright Act* ocupa el campo en el aspecto de los derechos patrimoniales de autor. Sobre este particular sostuvimos lo siguiente:

> ... Los demandantes no tienen fundamento alguno para reclamar en los tribunales de Puerto Rico regalías derivables del alegado enriquecimiento injusto de los demandados u otra compensación fundada en la violación de un derecho patrimonial reconocido federalmente. *En lo que respecta a los derechos patrimoniales equivalentes a los derechos protegidos por la Ley*

---

([12]) Véanse: *Bordas & Co. v. Srio. de Agricultura*, 87 D.P.R. 534 (1963); *P.R. Consumer Affairs Dept. v. Isla Petroleum*, 485 U.S. 495, 497–498 (1988); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

*federal el campo está claramente ocupado.* (Énfasis suplido y escolio omitido.) *Pancorbo v. Wometco de P.R., Inc.,* supra, pág. 502.

Según lo antes expuesto, la sec. 301(a) de la *Federal Copyright Act,* 17 U.S.C., dispone que:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the *exclusive rights within the general scope of copyright as specified by section 106* in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State. (Énfasis suplido.)

Como puede verse, la *Federal Copyright Act* gobierna exclusivamente tan sólo los derechos legales o en equidad equivalentes a cualquiera de los derechos exclusivos, dentro del ámbito general del derecho de autor, especificados en la sec. 106 de la referida ley, 17 U.S.C., que en lo pertinente dispone:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

Claramente puede concluirse que el alcance de la

legislación federal es estrictamente patrimonial. La doctrina establecida en *Pancorbo v. Wometco de P.R., Inc.*, supra, continúa en vigencia. Resolvimos allí que la "ley federal gobierna exclusivamente tan sólo 'los derechos legales o en equidad equivalentes a cualquiera de los derechos exclusivos, dentro del ámbito general del derecho de autor ...' ".[13] Concluimos, pues, que "si la acción estatal intenta proteger derechos que radican fuera del ámbito de la política federal y si tales derechos tienen por fuente intereses locales de honda raíz",[14] tal acción no está desplazada por la legislación federal. Más aun, aporta a nuestra conclusión el hecho de que precisamente en otras jurisdicciones estatales se ha comenzado a proteger los derechos morales de autor, siguiendo así la tradición civilista de proteger ambas facetas de la propiedad intelectual.[15]

La Legislatura del estado de California aprobó en 1979 la primera de estas legislaciones protectoras de los derechos morales en la que determinó que:

> ... the physical alteration or destruction of fine art, which is an expression of the artist's personality, is detrimental to the artist's reputation, and artists therefore have an interest in protecting their works of fine art against such alteration or destruction; and that there is also a public interest in preserving the integrity of cultural and artistic creations.[16]

De igual forma, en el estado de Nueva York se creó en 1984 la *Arts and Cultural Affairs Law*[17] en cuya Sec. 14.03 se dispone que ninguna persona que no sea el artista

---

[13] *Pancorbo v. Wometco de P.R., Inc.*, 115 D.P.R. 495, 499 (1984).

[14] *Pancorbo v. Wometco de P.R., Inc.*, supra, pág. 500.

[15] Véase, por ejemplo, Cal. Civ. Code sec. 987 (West Supp. 1995); Conn. Gen. Stat. Ann. sec. 42–116t (West 1995); La. Rev. Stat. Ann. sec. 51:2153–55 (West 1995); Me. Rev. Stat. Ann. tit. 27, sec. 303 (West 1995); Mass. Gen. Laws Ann. ch. 231, sec. 85S (West Supp. 1995); N.J. Stat. Ann. sec. 2A:24A–4 (West 1995); N.M. Stat. Ann. sec. 13–4B–3(A) (Michie 1995); 73 Pa. Cons. Stat. Ann. sec. 2104 (Supp. 1995); R.I. Gen. Laws sec. 5–62–3 (1995).

[16] Cal. Civ. Code sec. 987(a) (West Supp. 1995).

[17] New York *Arts and Cultural Affairs Law* Sec. 14.03 (CLS, 1995).

o su designado puede exhibir en un lugar público o publicar una reproducción de manera:

> [...] altered, defaced, mutilated or [in] modified form if the work is displayed, *published or reproduced* as being the work of the artist, or under circumstances under which it would reasonably be regarded as being the work of the artist, and damage to the artist's reputation is reasonably likely to result there from [...][18] (Énfasis suplido.) N.Y. Arts & Cult. Aff. sec. 14.03 (McKinney 1984).

Sobre este particular, se resolvió en esa jurisdicción que:

> Reproduction of minor, unrepresentative segments of works of multi-media artist in brochure violated CLS Arts & Cult. Affrs. Law sec. 14.03(1), where artist sought to enjoin publication of brochure by nonprofit group protesting tax-based funding of artist's work, which brochure contained photographic reproductions of portions of artist's work, because extracting fragmented images from complex, multi-imaged collages clearly alters and modifies such work.[19]

También se determinó en el antes citado caso, que las reclamaciones sobre derechos morales realizadas al amparo de la legislación estatal no estaban en contravención con la legislación federal de *copyright*.[20]

Con posterioridad a nuestras expresiones en *Pancorbo v. Wometco de P.R., Inc.*, supra, el Congreso aprobó una legislación federal que al presente protege los derechos morales de autor. Luego de que Estados Unidos se acogiera al Tratado de Berna,[21] el Congreso aprobó la *Visual Artists Rights Act*[22] el 1ro de diciembre de 1990. En dicho estatuto se acoge el principio básico civilista de que se debe

---

[18] Íd.

[19] *Wojnarowicz v. American Family Ass'n.*, 745 F.Supp. 130, 135–139 (S.N. N.Y. 1990).

[20] *Wojnarowicz v. American Family Ass'n.*, supra, págs. 135–136.

[21] Véase *Berne Convention Implementation Act of 1988*, L. Núm. 100–568, Sec. 2, 102 Stat. 2853 (1988), donde se acoge el Tratado de Berna sobre derechos de autor.

[22] 17 U.S.C. secs. 101, 106A, 107, 113, 301, 411, 412, 501, 506 (en adelante Ley VARA).

proteger el derecho moral del autor y se dispone, en lo pertinente, que el artista tendrá derecho a:

> ...prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right ....[23]

En el caso de autos, dicho estatuto en nada afecta la determinación que hiciera el foro de instancia. La legislación federal que protege el derecho moral del autor fue aprobada con posterioridad a los hechos del caso de autos. Además, dicha legislación federal es de aplicación a obras de doscientos (200) ejemplares o menos.[24] En el caso ante nos, la obra mutilada tuvo una edición de doscientos cincuenta (250) ejemplares. Por último, la nueva legislación federal no ocupa el campo permitiendo que los estados, o como en este caso Puerto Rico, puedan legislar a favor de los derechos morales de sus autores cuando la legislación federal no protege estos derechos.

En *Pancorbo v. Wometco de P.R., Inc.*, supra, resolvimos que la *Federal Copyright Act* no ocupaba el campo en cuanto a los derechos morales de los autores en Puerto Rico. Bajo las enmiendas que añadió el nuevo estatuto federal, tales determinaciones continúan sustancialmente en vigor.

Al respecto, *Visual Artists Rights Act of 1990* (17 U.S.C. sec. 301(f)) dispone que:

> (f)(1) On or after the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, all legal or equitable rights that are equivalent to any of the rights conferred by section 106A with respect to works of visual art to which the rights conferred by section 106A apply are governed exclusively by section 106A and section 113(d) and the provisions of this title relating to such sections. Thereafter, *no person is entitled*

---

[23] 17 U.S.C. secs. 106A(a) (3)(A).
[24] 17 U.S.C. sec. 101(1).

*to any such right or equivalent right in any work of visual art under the common law or statutes of any State.*

(2) Nothing in paragraph (1) annuls or limits any rights or remedies under the common law or statutes of any State with respecto to—

(A) any cause of action from undertakings commenced before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990;

(B) activities violating legal or equitable rights that are not equivalent to any of the rights conferred by section 106A with respect to works of visual art; or

(C) activities violating legal or equitable rights which extend beyond the life of the author. (Énfasis suplido.)

Claramente nos encontramos ante un caso en el que el Congreso expresamente declaró su intención reguladora en cuanto a un área específica. Técnicamente la situación del caso de autos no cae bajo el alcance del estatuto federal ya que, como mencionamos anteriormente, su edición sobrepasa los doscientos (200) ejemplares seriados y el estatuto federal tiene efecto prospectivo luego de su aprobación en 1990.

En Puerto Rico, la Asamblea Legislativa, con la reafirmación de que no existe base en derecho para sostener que la *Federal Copyright Act* aboliera la doctrina del derecho moral en nuestra jurisdicción, aprobó en 1988 la Ley de Propiedad Intelectual con el fin de "promover el que la comunidad intelectual del país goce de la mayor protección de sus derechos".(25)

En la propia exposición de motivos del citado estatuto, se puede apreciar que la Asamblea Legislativa utilizó como norte los criterios que esbozamos en *Pancorbo v. Wometco de P.R., Inc.*, supra, a los efectos de que a pesar de la aplicación en nuestra jurisdicción de la *Federal Copyright Act*, ésta no "ocupaba el campo" en torno a la protección de los derechos morales de autor ya que "si el interés que se desea proteger localmente es distinto a aquellos que el esta-

---

(25) Exposición de Motivos de la Ley Núm. 96, *supra*, 1988 Leyes de Puerto Rico, pág. 429.

tuto federal protege, la acción estatal no queda desplazada".(26) Con posterioridad, el Congreso aprobó la citada Ley VARA, sin embargo, el alcance limitado de esta legislación federal no tiene aplicación al caso de autos y solamente afectaría de forma limitada los alcances de la ley local.(27)

El propósito fundamental de la Ley de Propiedad Intelectual es promover la protección de los derechos de nuestra comunidad intelectual, fortaleciendo la legislación local con la actualización de las disposiciones contenidas en la Ley sobre Propiedad Intelectual española de 10 de enero de 1879.(28)

■ La propia Ley de Propiedad Intelectual, *supra*, dispone en su Art. 1 que "[e]l derecho moral es aquél que permite, a quien crea una obra, gozar de la protección del derecho de propiedad intelectual".(29)

■ Podemos concluir, pues, que la legislación federal no ocupa el campo ni impide que la Ley de Propiedad Intelectual proteja los derechos morales de los autores en

---

(26) *Pancorbo v. Wometco de P.R., Inc.*, supra, pág. 500.

(27) Primeramente, VARA, a diferencia de la Ley Federal de Copyright, que solamente protege los derechos patrimoniales y no los derechos morales de autor, regula un área limitada de los derechos morales, ya que solamente aplica a trabajos de artes visuales. Al respecto, el propio estatuto define los trabajos de artes visuales.

"A 'work of visual art' is—

"(1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

"(2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author."

Resultaría incongruente pretender que una ley que tiene un alcance limitado a una minúscula fracción de la producción artística de la que son capaces los seres humanos, ocupe el campo de forma tal que impida que los estados, o Puerto Rico, legislen para favorecer los derechos morales de sus autores de una forma más abarcadora y completa. Al respecto, el propio estatuto, en la sección 301(f)(2), *supra*, dispone que las leyes estatales que no estén en conflicto con el estatuto federal continuarán en vigor.

(28) Véase *Op. Sec. Just. Núm. 1988–28.*

(29) 31 L.P.R.A. sec. 1401a.

Puerto Rico, con excepción de los que quedan directamente excluidos por el estatuto federal.

Un análisis de la sentencia recurrida nos obliga a concluir que no le asiste la razón a la parte demandada recurrente en cuanto a su primer planteamiento de derecho ya que el tribunal de instancia no concedió compensación alguna por concepto de daños patrimoniales.

El tribunal a quo concedió compensación a los demandantes recurridos en concepto de "la publicación no autorizada y mutilación ...".([30]) Ello no significa que la compensación concedida se deba reducir bajo la premisa de que el tribunal de instancia carecía de jurisdicción para conceder daños patrimoniales. Las expresiones del tribunal sobre la publicación no autorizada de la obra son meramente una referencia lógica de la prueba desfilada, y no el *fundamento* para la concesión del remedio. Éste está amparado en los daños morales causados por la *mutilación*.

## III

En su segundo señalamiento, los demandados recurrentes aducen, en síntesis, que la serigrafía "De Fiesta en la Calle" no fue mutilada.

Al respecto el tribunal de instancia determinó que:

> ...la obra de Don Sixto Cotto ha sido mutilada dentr[o] del concepto de lo que "MUTILACIÓN" SIGNIFICA CUANDO SE TRATA DEL DERECHO DE PROPIEDAD INTELECTUAL DENTRO DEL CONCEPTO DE DERECHO MORAL DEL AUTOR.([31])

Sobre este particular el perito del demandante recurrido, Jesús M. Díaz Caraballo, quien se especializa en la evaluación y tasación de obras de arte, expresó que en efecto la obra aquí en controversia había sido publicada en

---

([30]) Solicitud de revisión, Apéndice, pág 19.

([31]) Solicitud de revisión, pág. 4.

forma mutilada. Al respecto el tribunal a quo en sus determinaciones de hechos expresó que "[n]o se trata de cambios o modificaciones en la obra que sean intranscendentes o accesorias, sino que se trata de asuntos importantes a la obra misma y al buen nombre y prestigio de su autor".[32]

█ El derecho moral de autor constituye un derecho privado que tiene por objeto no la obra del ingenio, que es un bien de naturaleza patrimonial, sino el bien personal de la paternidad intelectual, modo de ser moral de la personalidad del propio autor. En el derecho civil se ha clasificado el derecho moral de autor como un derecho personalísimo, junto a otros derechos tales como el derecho a la vida, a la libertad e integridad física, derecho al honor, derecho a la imagen y otros.[33]

Nos dice Castán,[34] que los derechos de la personalidad son los que se "ejercitan sobre la propia persona ... o más propiamente ... sobre determinadas cualidades o atributos, físicos o morales, de la persona humana". Fue en la Conferencia Internacional de Roma en 1928 donde quedó consagrado en forma legislativa y con ámbito internacional el derecho moral de autor. Allí se dispuso que:

> Independientemente de los derechos patrimoniales del autor, y lo mismo después de la cesión de dichos derechos, el autor conserva el derecho de reivindicar la paternidad de la obra, así como el derecho de oponerse a toda deformación, mutilación u otra modificación de dicha obra que fuere perjudicial a su honor o a su reputación.[35]

Según Castán,[36] integran el contenido del derecho mo-

---

[32] Solicitud de revisión, pág. 4.

[33] Véase, en términos generales, M.E. Martínez Rivera, *El Derecho de Autor en Puerto Rico ... ¿legislación judicial?* 21 Rev. Jur. U.I.A. 421, 424–425 (1987).

[34] J. Castán Tobeñas, *Los Derechos del Hombre*, Madrid, Ed. Reus, 1969, pág. 26.

[35] N. Pérez Serrano, *El Derecho moral de los autores*, 2 An. Der. Civ. 13 (1949).

[36] J. Castán Tobeñas, *Derecho Civil español, común y foral*, Madrid, Ed. Reus, 1984, T. I, Vol. 2, pág. 402.

ral de autor, como facultades o prerrogativas más sobresalientes las siguientes:

    (1) El derecho de publicación.
    (2) El derecho de paternidad intelectual.
    (3) *El derecho de defensa de la integridad de la obra, que en su aspecto positivo le autoriza para modificarla, y en el negativo para impedir que sea alterada o deformada por los demás.*
    (4) El derecho de arrepentimiento.

    ■  En nuestra jurisdicción, el derecho moral de autor está consagrado en la Ley de Propiedad Intelectual. Ésta dispone en su Art. 1 que "[l]a protección del derecho moral del creador de una obra es independiente de la protección de sus derechos patrimoniales".[37]

    El referido artículo también provee el mecanismo legal necesario para que se pueda reclamar una compensación si se probasen daños al derecho moral protegido. A tales efectos dispone que:

    La violación del derecho moral da derecho a solicitar remedios interdictales temporeros o permanentes, que incluyan la restitución, confiscación o destrucción de obras, según sea el caso. *Dicha violación también da derecho a reclamar daños.* Deberá establecerse un adecuado balance entre el derecho de propiedad del titular de una obra y el derecho moral de su autor. (Énfasis suplido.)[38]

    ■  Este artículo deja establecido que en efecto dentro del ordenamiento jurídico de nuestra jurisdicción en lo relativo a derechos morales de autor, la concesión de una compensación económica por daños y perjuicios es permisible y no contraviene la legislación federal.

    ■  El derecho moral del autor es usualmente clasificado en la doctrina civilista como un derecho de la personalidad, distinguiéndolo particularmente de los derechos patrimoniales. Dentro de los derechos de la personalidad

---

[37] 31 L.P.R.A. sec. 1401b.
[38] 31 L.P.R.A. sec. 1401f.

se incluyen: el derecho a la propia identidad, al nombre, a la reputación personal, a la ocupación, a la integridad de la propia persona y a la intimidad. Alguno de estos derechos, como el derecho a la integridad personal y el derecho a la intimidad, ya están protegidos en Puerto Rico por nuestra Constitución.

Ante todo, se estima que el derecho moral es un derecho absoluto, es decir, uno de esos derechos que revisten carácter universal y que implican, por lo tanto, un deber de todos los demás sujetos jurídicos con respecto a su titular. De ahí la obligación general que a todos incumbe de abstenerse y evitar cualquier trastorno o perturbación a ese derecho.[39]

Podemos concluir, pues, que en el caso de autos nos enfrentamos a una controversia exclusivamente de quebrantamiento del derecho moral de un autor, irrespectivamente de que pudieran existir otros daños o derechos patrimoniales recobrables bajo la *Federal Copyright Act*.

Como expresáramos anteriormente, uno de los aspectos más importantes del derecho moral de autor es el derecho del artista a mantener la integridad de su obra. Este derecho encuentra su fundamento en que la obra es una creación del espíritu y, por consiguiente, es una expresión de la propia personalidad e identidad del autor. Por ello, la distorsión, mutilación o falsa representación, maltrata una expresión de esa personalidad y el honor de su creador. La tendencia manifiesta de este Tribunal nos conduce a delinear los componentes del derecho moral de autor de la doctrina civilista en nuestra jurisdicción. En *Pancorbo v. Wometco de P.R., Inc.*, supra, págs. 501–502, expresamos que:

Entre otros intereses, el derecho moral salvaguarda la paternidad de la obra y su integridad, la defensa de esa integridad

---

[39] Véase Pérez Serrano, *supra*, págs. 22–23.

incluye el derecho a impedir que la obra sea alterada, deformada, truncada o expuesta en un contexto objetable.

En cuanto al aspecto de la mutilación de la obra al que se refieren los demandados recurrentes concluimos que tratándose el caso de autos de la apreciación· de prueba documental que obra en autos, estamos en igual posición que el foro de instancia de evaluarla.[40] Al igual que el foro recurrido, concluimos que la obra fue mutilada.

Los únicos que presentaron prueba pericial ante el tribunal a quo fueron los demandantes recurridos, mediante el testimonio de su perito, Jesús M. Díaz Caraballo, quien declaró a preguntas tanto de los demandantes recurridos como de los demandados recurrentes que la obra había sido mutilada al reproducirse en la página veintiocho (28) del catálogo en el cual aparece cortada en su margen izquierdo, eliminándose una franja vertical de aproximadamente tres octavos de pulgada (3/8") de área impresa. Al eliminarse esta franja se le cortó a la paloma de la rúbrica la mitad del cuerpo dejando solamente la cola y una pequeña parte del tronco y de un ala. Determinó el foro a quo que el señor Cotto utiliza frecuentemente una diminuta paloma como rúbrica en sus obras. Este elemento iconográfico es distintivo del trabajo del artista y se utiliza al igual que la firma. En el caso de autos la mutilación de la obra no solamente afecta la rúbrica del autor al quedar irreconocible, sino que también se afecta su composición general, al perderse un elemento que le impartía movimiento y continuidad a la escena incorporando el margen del papel a la totalidad de la composición artística.

La pérdida que sufre la obra como un todo se agrava al quedar incompleto el juego tridimensional que sirve de soporte y confirmación visual de lo que ocurre en el resto del diseño. La dualidad entre protuberancia y profundidad en el elemento geométrico rojo-verde del margen inferior, y el

---

[40] *Bco. Central Corp. v. Yauco Homes, Inc.*, 135 D.P.R. 858 (1994).

borde de luz vertical en el extremo izquierdo del plano oscuro que aparenta ser el apoyo horizontal del cuatro "gigante", se han eliminado, dejando a la obra impedida en su función de jugar con el espectador y hacerle saber que el tratamiento es intencional.

Inciden los demandados recurrentes al argumentar que por tratarse de una reproducción del original no se ha mutilado la obra objeto del presente pleito. Como hemos expuesto anteriormente, el derecho moral del autor emana de un respeto a su integridad personal e intelectual. La integridad personal no se desvanece por el mero hecho de que la obra se reproduzca, si al reproducirse se mutila según hemos descrito. Máxime cuando, como en el caso de autos, tal reproducción se hace sin el consentimiento del autor, aunque éste no pueda recobrar en la jurisdicción local la porción por dicho quebrantamiento.

La mutilación de la obra reproducida cuando ésta es publicada sin la autorización del autor involucra su derecho moral de forma parecida a la mutilación de la obra propiamente. Resolver lo contrario significaría abrir las puertas al abuso indiscriminado por parte de terceros aprovechados del caudal artístico que producen nuestros artistas.

En cuanto a la imposición de daños por parte del tribunal de instancia, dicho foro dispuso en su sentencia que los aquí demandados recurrentes estaban obligados solidariamente ante los demandantes recurridos a pagar por los "daños que se le han ocasionado como consecuencia de la *publicación no autorizada, y mutilación* de la obra del autor Don Sixto Cotto y los daños accidentales sufridos por su esposa como consecuencia de las actuaciones culposas y negligentes de la parte demandada ...".[41] (Énfasis suplido.) Al así resolver, el tribunal a quo concedió la suma global de dieciocho mil dólares ($18,000) a los demandan-

---

[41] Solicitud de revisión, págs. 19–20.

tes recurridos que se distribuyen en doce mil ($12,000) al Sr. Sixto Cotto y seis mil ($6,000) a su esposa. Al respecto, el autor Nicolás Pérez Serrano expresa en su obra que el derecho moral de autor es un derecho no evaluable en dinero ya que no se trata de un derecho patrimonial. Sin embargo, el mismo autor reconoce que esto "no quiere decir que en caso de lesión o agravio no tenga el titular la facultad de reclamar indemnización".[42]

La gestión judicial de estimación y valorización de los daños es difícil y angustiosa. En esta gestión los tribunales de primera instancia están en mejor posición que el tribunal apelativo, por razón de su contacto directo con la prueba. De ahí que el tribunal apelativo sólo alterará las sumas concedidas por daños cuando sean ridículamente bajas o exageradamente altas.[43] Determinamos que las cuantías concedidas están justificadas como compensación por el daño moral sufrido por los demandantes recurridos, daño que la Ley de Propiedad Intelectual, en su Art. 1401f, *supra*, les permite recobrar.

En cuanto a la determinación de temeridad por parte del tribunal de instancia, expresamos en *Miranda v. E.L.A.*, 137 D.P.R. 700, 719 (1994), que " '[l]a determinación sobre si una parte ha procedido con temeridad o no descansa en la sana discreción del tribunal' ". La partida de honorarios de abogado concedida no variará en apelación, a menos que la misma sea excesiva, exigua o constituya un abuso de discreción.[44]

Sin existir en el caso de autos elementos de abuso de discreción que nos muevan a variar la determinación del tribunal de instancia sobre esta partida, ésta permanecerá inalterada.

---

[42] Pérez Serrano, *supra*, pág. 23.

[43] *Vélez Rodríguez v. Amaro Cora*, 138 D.P.R. 182 (1995).

[44] Véase *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339, 350 (1989).

En conclusión, en el caso de autos la parte demandada recurrente quebrantó con sus actuaciones negligentes y culposas el derecho moral del autor de la obra "De Fiesta en la Calle", por lo cual *procede que confirmemos la sentencia recurrida.*

El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.