

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan C. Negrón Miró y Mayra Nieves, la Sociedad Ganancial que ambos componen<br><br>Peticionarios<br><br>v.<br><br>Roberto Vera Monroig y Jane Doe,<br><br>Sociedad Ganancial compuesta por ambos, Compañía de Impresos XYZ, Inc.  , Compañía de Rotulaciones XYZ, Inc. demandados desconocidos<br><br>Recurridos | Certiorari<br><br>2011 TSPR    90<br><br>18 2  DPR ____ |

Número del Caso: CC        - 2009 - 871

Fecha: 16 de junio de 2011

Tribunal de Apelaciones:

Región Judicial de Utuado Panel XI

Juez Ponente:

Hon. Carlos A. Cabán García

Abogado de la Parte Peticionaria:

Lcdo. Carlos Fernández Nadal

Abogados de la Parte Recurrida:

L cdo. Daniel A. Rivera Hernández
Lcdo. Miguel J. Negrón Vives

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a                                    la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan C. Negrón Miró y Mayra Nieves, la Sociedad Ganancial que ambos componen<br><br>Peticionarios<br><br>v.<br><br>Roberto Vera Monroig y Jane Doe, Sociedad Ganancial compuesta por ambos, Compañía de Impresos XYZ, Inc., Compañía de Rotulaciones XYZ, Inc. demandados desconocidos<br><br>Recurridos | CC-2009-871 |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez.

San Juan, Puerto Rico, a 16 de junio de 2011

Esta vez debemos aclarar si un autor tiene que inscribir su obra y sus derechos morales de autor en el Registro de la Propiedad Intelectual de Puerto Rico para que dichos derechos sean efectivos y el autor tenga a su haber los remedios provistos en la referida legislación. Tras examinar la naturaleza de los derechos morales de autor, así como el historial y propósitos de la Ley de Propiedad Intelectual, concluimos que actualmente la inscripción en el Registro de la Propiedad Intelectual es un acto voluntario, pero necesario para poder instar una acción judicial procurando remediar la transgresión de los derechos morales.

I.

El 23 de enero de 2006, el señor Juan C. Negrón Miró, la señora Mayra Nieves y la sociedad legal de gananciales compuesta por ambos, presentaron una demanda de daños y

perjuicios contra el señor Roberto Vera Monroig, entre otros. En esencia, alegaban que el Sr. Negrón Miró es fotógrafo profesional y creador de una foto aérea del Municipio de Adjuntas, la cual había sido utilizada por el demandado —entonces Alcalde del referido Municipio— en el año 2004 como parte de su campaña política a la reelección. Se alegó que el demandado utilizó y mutiló la obra del fotógrafo sin obtener su autorización, violando así sus derechos morales de autor.

Tras comenzar el descubrimiento de prueba, los demandados presentaron una moción de desestimación en la cual sostuvieron que el autor de la foto no tenía su obra y derechos morales inscritos en el Registro de la Propiedad Intelectual de Puerto Rico, lo cual impedía que instara la presente reclamación. Oportunamente la parte demandante presentó su réplica oponiéndose a la desestimación. Así las cosas, luego de evaluar los argumentos de las partes, el Tribunal de Primera Instancia desestimó con perjuicio la acción mediante sentencia dictada el 8 de mayo de 2009, notificada el 14 de mayo de 2009.

El 12 de junio del mismo año, los demandantes presentaron un recurso de apelación ante el Tribunal de Apelaciones. Allí expresaron que el foro primario había errado al condicionar sus derechos y reclamaciones sobre derechos morales de autor a la previa inscripción de la obra en el Registro de la Propiedad Intelectual. No obstante, el foro apelativo intermedio confirmó la sentencia recurrida.

El tribunal razonó que la Ley de Propiedad Intelectual de Puerto Rico, *infra*, requiere que la inscripción de la obra se realice "con anterioridad a los hechos" que alegadamente infringen los derechos morales del autor. Su determinación se notificó el 14 de septiembre del 2009. Inconformes aún, el 14 de octubre de 2009, los demandantes presentaron un recurso de *certiorari* ante este Foro solicitando la revocación de la sentencia emitida por el Tribunal de Apelaciones. El 26 de marzo de 2010, expedimos el recurso solicitado, tras lo cual ambas partes presentaron sus respectivos alegatos.

Los peticionarios sostienen que nuestro ordenamiento no exige la inscripción de la obra y el derecho moral del autor para que éste tenga a su haber las prerrogativas reconocidas en la Ley de Propiedad Intelectual, pues éstas le asisten al autor desde el instante en que su obra es creada. Por su parte, los recurridos replican que la Ley de Propiedad Intelectual expresamente condiciona el disfrute del derecho moral del autor, a la inscripción de la obra y el derecho moral en el Registro de la Propiedad Intelectual. Visto el trasfondo fáctico, así como la dialéctica de las partes, pasamos a resolver.

## II.

La controversia ante nosotros requiere interpretar el texto del artículo 359*ll* de la Ley de Propiedad Intelectual de Puerto Rico. 31 L.P.R.A. sec. 1402d. Específicamente, la interrogante que atendemos surge por la oración final de dicho artículo, la cual fue incluida como una enmienda, junto

a otras, mediante la Ley Núm. 56 de 24 de junio de 1996. Tras la aprobación de esta ley, el referido artículo dispone:

> Podrán, a solicitud de su autor o sus derechohabientes, registrarse en el Registro de la Propiedad Intelectual [varios tipos de obras].
> . . . Las inscripciones que autoriza esta sección tendrán el efecto de reservar a favor del autor de la obra inscrita o de sus derechohabientes, el correspondiente derecho de la propiedad intelectual. *Para gozar de los beneficios de esta Ley[1] es necesario haber inscrito el derecho y las obras que lo sustentan en el Registro de la Propiedad Intelectual, con arreglo a lo establecido en las secciones anteriores.* (Énfasis suplido).

31 L.P.R.A. sec. 1402d.

En vías de disponer del presente asunto, es necesario repasar los principios que nutren la figura del derecho moral y auscultar la evolución histórica sobre los requerimientos de formalidades a los cuales se ha sujetado la efectividad de los derechos de autor. Asimismo, al ejercer nuestra función adjudicativa, hemos de seguir el mandato legislativo dispuesto en la propia Ley de Propiedad Intelectual, el cual ordena que ésta "deberá interpretarse y aplicarse por los tribunales y organismos administrativos de Puerto Rico, de forma que auxilie y haga efectivos en la práctica para los autores puertorriqueños, los derechos que reconoce la Ley de Derechos de Autor de los Estados Unidos y en lo dispuesto en

---

[1] Existe una discrepancia entre el texto publicado en las Leyes de Puerto Rico, donde lee "beneficios de esta *Ley*", 1996 Leyes de Puerto Rico 236, y las Leyes de Puerto Rico Anotadas, en la cual se expresa "beneficios de este *capítulo*", 31 L.P.R.A. sec. 1402d (Supl. 2010) (Énfasis suplidos). Acogemos el texto aprobado por la Asamblea Legislativa en el P. del S. 1313 del 30 de enero de 1996, según publicado en las Leyes de Puerto Rico.

ésa y en la [Ley de Propiedad Intelectual de Puerto Rico] . . .". 31 L.P.R.A. sec. 1402m.

A.

En repetidas ocasiones hemos expresado que los derechos de autor en nuestra jurisdicción están cobijados por el *Federal Copyright Act*, 17 U.S.C. sec. 101 *et seq.*, y la Ley de Propiedad Intelectual de Puerto Rico, 31 L.P.R.A. sec. 1401 *et seq. Harguindey Ferrer v. U.I.*, 148 D.P.R. 13, 27 (1999); *Cotto Morales v. Ríos*, 140 D.P.R. 604, 611 (1996). De forma supletoria, las disposiciones del Código Civil pueden aplicarse a controversias sobre derechos de autor en tanto no sean incompatibles con estos estatutos. *Reynal v. Tribunal Superior*, 102 D.P.R. 260 (1974). La combinación de estas leyes provee a los autores una protección abarcadora, fijando derechos patrimoniales y extra-patrimoniales; estos últimos mejor conocidos como derechos morales.

Los derechos patrimoniales delimitan la facultad del autor de explotar económicamente su obra, mientras los derechos morales protegen el vínculo personal entre el autor y su creación. *Cotto Morales v. Ríos*, *supra*, pág. 612. Si bien los derechos patrimoniales están ampliamente regulados por la legislación federal, en ésta los derechos morales gozan de una protección muy limitada. Específicamente, desde la promulgación de la *Visual Artists Rights Act* ("VARA"), Pub. L. No. 101-650, 104 Stat. 5128 (1990), solo los autores de ciertas obras de "arte visual" ("*works of visual art*") pueden disfrutar del derecho moral federal de atribución e integridad. Por ello nuestra Ley de Propiedad Intelectual

tiene un radio extenso de aplicación al establecer los derechos morales de los autores, siempre y cuando, claro está, no entre en conflicto con el estatuto federal. *Cotto Morales v. Ríos, supra; Pancorbo v. Wometco de P.R., Inc.*, 115 D.P.R. 495 (1984).[2]

En cuanto al derecho moral del autor, nuestra Ley de Propiedad Intelectual reconoce que el creador de la obra tiene "las prerrogativas exclusivas de atribuirse o retractar su autoría, disponer de su obra, autorizar su publicación y proteger su integridad". 31 L.P.R.A. sec. 1401. Estos derechos le asisten al autor en virtud del acto creador de la obra, sin más. 31 L.P.R.A. sec. 1401a. *Véase, Harguindey Ferrer v. U.I., supra*, pág. 22 ("De un examen de nuestra Ley de Propiedad Intelectual se desprende que la propiedad intelectual de una obra corresponde al autor por el solo hecho de su creación."); *Ossorio Ruiz v. Srio. de la Vivienda*, 106 D.P.R. 49, 55 (1977) ("El derecho moral nace

---

[2] Advertimos que el caso ante nosotros trata sobre un alegado uso y mutilación de una fotografía. Aunque la *Visual Artists Rights Act* brinda a los autores el derecho moral de atribución e integridad sobre ciertas fotos, para que éstas estén cobijadas por el estatuto tienen que cumplir con varios requisitos que comprenden, tanto sus características físicas, como el propósito para el cual fueron creadas. 17 U.S.C.A. secs. 101, 106A. Si la fotografía en controversia satisficiera dichos requisitos, podría estar dentro del campo ocupado por la legislación federal, quedando los tribunales estatales privados de jurisdicción. *Véanse, Cotto Morales v. Ríos*, 140 D.P.R. 604 (1996); Melville B. Nimmer & Davis Nimmer, *Nimmer on Copyright*, Matthew Bender, Ed. Rev., Vol. 3, Sec. 8D.06; Robert J. Sherman, *The Visual Artists Rights Act of 1990: American Artists Burned Again*, 17 Cardozo L. Rev. 373, 410-12 (1995). No obstante, debido a que el expediente ante este Foro no provee información suficiente para evaluar este asunto, no nos es posible disponer del mismo.

con la obra misma y subsiste . . . aun despúes de su cesión.") (Citas omitidas).

Lo que caracteriza al derecho moral, en contraposición a los derechos patrimoniales, es la zona de intereses que pretende proteger, a saber, la relación personalísima existente entre el autor y su obra. Sus cimientos nos refieren al medio por el cual tiene origen su labor. Durante el proceso creativo, el autor puede imaginar cómo será su proyecto culminado, lo puede diseñar y, una vez iniciado, podría destruirlo por su insatisfacción para luego volver a comenzar. O bien podría cometer un error y, por accidente, producir su pieza. De todas formas, en cada etapa del proceso, el carácter, las vivencias y la ideología del autor se van plasmando en su obra. Por ello, el producto final no es menos que el reflejo del ser humano responsable de su creación; es decir, la obra del autor "es de hecho una prolongación de su personalidad". *Ossorio Ruiz v. Srio. de la Vivienda*, *supra*, pág. 55. Una mirada a la obra es una mirada al interior de su autor.[3] Tan estrecha relación nos

---

[3] *Véase* Susan P. Liemer, *Understanding Artists' Moral Rights: A Primer*, 7 B.U. Int. L.J. 41, 43 (1998) ("The unique relationship between an artist, the creative process, and the resultant art makes an artist unusually vulnerable to certain personal harms. The art an artist produces is, in a sense, an extension of herself. The artists' connection to her art is much more personal and simply qualitatively different from the relationship of most other people to other objects and activities. . . . The artist stands uniquely open to attack upon her psyche because she is so closely connected to the creative process and the creative product. A blow to either the process or product may be a blow to her personally. Because the artist infuses her work with her own personality, a harm to the work or her relationship to the work may well harm the artist herself. The artists' reaction may even

ha llevado a expresar que la afrenta sufrida por la obra, lesiona a su vez la "personalidad y dignidad de su creador". *Id. Véase, Cotto Morales v. Ríos, supra*, pág. 623 ("Por ello, la distorsión, mutilación o falsa representación, maltrata una expresión de esa personalidad y el honor de su creador.").

No tratamos con un mero interés o privilegio, estamos frente a un derecho de suma importancia reconocido por ley. "En el derecho civil se ha clasificado el derecho moral de autor como un derecho personalísimo, junto a otros derechos tales como el derecho a la vida, a la libertad e integridad física, derecho al honor, derecho a la imagen y otros." *Cotto Morales v. Ríos, supra*, pág. 621 (1996). *Véase* Gerard Gavin, *Le Droit Moral de l'Auteur dans la Jurisprudence et la Législation Françaises*, Paris, 1960, Sec. 255. Éste incluso formó parte de los derechos humanos reconocidos en la Declaración Universal de los Derechos del Hombre. Art. 27.2 de la Declaración Universal de los Derechos del Hombre (1948) ("Toda persona tiene derecho a la protección de los *intereses morales* y materiales que le correspondan por razón de las producciones científicas, literarias o artísticas de que sea autora.") (Énfasis suplido). *Véanse* Robert C. Bird, *Moral Rights: Diagnosis and Rehabilitation*, 46 Am. Bus. L.J. 407, 410 (2009) ("These rights are often conceived as a fundamental human right or a personal civil right, grounded in the author's essential personhood and the projection of

_____

resemble her reaction to a physical injury to herself or someone very close to her.") (Citas omitidas).

that personhood on an artistic or creative work."); Benjamin Davidson, *Lost in Translation: Distinguishing Between French and Anglo-American Natural Rights in Literary Property, and how* Dastar *Proves that the Difference Still Matters*, 38 Cornell Int'l L.J. 583, 585-86 (2005); Daniel J. Gervais, *The Internationalization of Intellectual Property: New Challenges from the Very Old and the Very New*, 12 Fordham Intell. Prop. Media & Ent. L.J. 929, 934 (2002); Susan P. Liemer, *Understanding Artists' Moral Rights: A Primer*, 7 B.U. Int. L.J. 41, 42 (1998).

Esas características que definen el derecho moral del autor han llevado a algunos académicos a impulsar su reconocimiento como derecho humano. Otros han señalado su relevancia en la protección de algunos derechos constitucionales. Por ejemplo, el Dr. Ulrich Uchtenhagen, distinguido profesor y consultor de la Organización Mundial de Propiedad Intelectual, comentó que:

> El derecho de autor además se encuentra en las inmediaciones de la libertad de expresión. [É]sta sería inútil si la expresión personal pudiera ser falseada o incluso torcido su sentido hasta volverlo en su contrario. La protección de la opinión expresada contra su desfiguración y su mutilación y el derecho de constar con el nombre en relación con la expresión manifestada —el "derecho moral" del autor— por lo tanto constituyen el complemento en el derecho privado de la libertad de expresión.

Ulrich Uchtenhagen, *El Derecho de Autor como Derecho Humano*, Revista de Derecho Privado, Núm. 3, pág. 8 (1998). Por nuestra parte, incluso previo a la aprobación de la Ley de Propiedad Intelectual, ya habíamos llamado la atención a la

tangencia evidente entre el derecho moral del autor y la cláusula constitucional que protege la dignidad del ser humano, declarando que ésta es inviolable. *Ossorio Ruiz v. Srio. de la Vivienda*, *supra*, pág. 55, n. 2; Art. II., Sec. 1, Const. E.L.A., 1 L.P.R.A. También afirmamos que los derechos morales son "uno de esos derechos que revisten carácter universal y que implican, por lo tanto, un deber de todos los demás sujetos jurídicos con respecto a su titular. De ahí la obligación general que a todos incumbe de abstenerse y evitar cualquier trastorno o perturbación a ese derecho." *Cotto Morales v. Ríos*, *supra*, pág. 623.

Visto lo anterior, es evidente que el derecho moral del autor se revela trascendental en nuestro ordenamiento jurídico. Ahora bien, ¿es necesario inscribir dicho derecho, y la obra sobre la cual recae, para poder ejercerlo plenamente? Antes de formular nuestra respuesta, es meritorio explorar cuál ha sido el desarrollo de las exigencias relativas a las formalidades en los derechos de autor. Especialmente, echaremos una mirada al curso seguido en España y Estados Unidos, por ser las tradiciones jurídicas de mayor relevancia en el desarrollo de nuestro Derecho.

B.

En el ámbito internacional, mediante el Convenio de Berna para la Protección de las Obras Literarias y Artísticas ("Convención de Berna"), la mayor parte de las naciones han acordado que el "goce y el ejercicio de [los derechos de autor] no estarán subordinados a ninguna formalidad . . .". Art. 5(2) del Convenio de Berna para la Protección de las

Obras Literarias y Artísticas (1971). Desde entonces, muchos países han modificado sus legislaciones para establecer registros nacionales, de carácter voluntario, donde se pueden inscribir los derechos de autor. Éstos han seguido una tendencia moderna en la que la inscripción se percibe como un medio facilitador del ejercicio de los derechos, ya que brinda a los autores una forma simple y efectiva de probar su autoría y el derecho que les asiste. *Véase* Organización Mundial de Propiedad Intelectual, *Copyright Registration and Documentation*, http://www.wipo.int/copyright/en/activities/ copyright_registration/ (última visita el 15 de junio de 2011).

Por otro lado, en España los antecedentes históricos de las formalidades a las que se sujetaba la propiedad intelectual se remontan al año 1847. El 10 de junio de ese año, se promulgó una ley que requería el depósito de la obra en dos instituciones del Estado para poder garantizar el derecho de propiedad del autor sobre su obra. Art. 13, Ley de 10 de junio de 1847 (derogada) ("Ningún autor gozará de los beneficios de esta Ley si no probase haber depositado un ejemplar de la obra que publique en la Biblioteca Nacional, y otro en el Ministerio de Instrucción Pública, antes de anunciarse su venta."). Posteriormente, mediante la Ley Española de Propiedad Intelectual de 10 de enero de 1879 —la cual estuvo en vigor en Puerto Rico— se creó un Registro General de la Propiedad Intelectual. El artículo 36 de este estatuto contenía un lenguaje casi idéntico al dispuesto en

el artículo 359*ll* de nuestra Ley de Propiedad Intelectual que provoca la controversia que atendemos. Aquél disponía: "Para gozar de los beneficios de esta Ley es necesario haber inscrito el derecho en el Registro de la Propiedad Intelectual con arreglo a lo establecido en los artículos anteriores." Art. 36, Ley de 10 de enero de 1879 (derogada). Dicha inscripción tenía que realizarse dentro de un año, a partir de su publicación, y a falta de tal inscripción, estaría en el dominio público[4] por diez años, tras lo cual el autor tendría nuevamente un año con la posibilidad de inscribir su obra. De no hacerlo, la obra pasaría al dominio público permanentemente. *Id.*

Los tratadistas de la época expresaban que "[p]ara la legislación española, es condición *sine qua non* la inscripción en el Registro del derecho de propiedad intelectual si se quiere disfrutar de la protección legal". Juan Giménez Bayo & Lino Rodríguez-Arias Bustamante, *La Propiedad Intelectual: Compilación y Comentarios de las Disposiciones Legales Vigentes en España con su Jurisprudencia*, Ed. Reus, Madrid, 1949, pág. 238. *Véase además* José María Manresa y Navarro, *Comentarios al Código Civil Español*, Ed. Reus, Madrid, Tomo III, 8[va] ed., 1976, pág. 866. Inclusive, el principal autor de la Ley Española de 1879, el jurisconsulto Danvila y Collado, comentaba que

---

[4] El término "dominio público" se refiere a la extinción de los derechos exclusivos que provee a los autores la legislación sobre propiedad intelectual. En términos generales, una vez la obra pasa al "dominio público", toda la sociedad puede hacer uso de aquellas facultadas que hasta entonces habían sido reservadas para el autor.

"[l]a declaración que hace la Ley es terminante. Sus beneficios no puede gozarlos sino aquel que ha inscrito su derecho en el Registro . . . y de tal manera lo hace obligatorio, que dice es necesario o, mejor dicho, indispensable. No basta ser autor de una obra para tener derecho a explotarla exclusivamente. Para adquirirle es necesario inscribir, y el que no inscribe podrá tener la gloria de la obra, pero no adquirirá sobre ella la propiedad legal." Giménez Bayo & Rodríguez-Arias Bustamante, *op. cit.*, pág. 239, citando a Danvila y Collado.[5]

No obstante, con el pasar de los años —y una fuerte crítica al requerimiento de formalidades para garantizar la protección de la propiedad intelectual— se fue desarrollando un mejor entendimiento del derecho de autor y del vínculo entre la obra y su creador. Así, bajo la vigente Ley Española de Propiedad Intelectual, quedó eliminada la exigencia de inscribir el derecho sobre la obra en el Registro. *Véase* José Castán Tobeñas, *Derecho Civil Español: Común y Foral*, Ed. Reus, Madrid, Tomo II, Vol. I, 14ta ed., 1992, pág. 613 ("la inscripción ya no es un requisito para el

---

[5] Esta lectura de la Ley Española de Propiedad Intelectual de 1879, no es compartida por todos los académicos españoles. *Véase* José María Chico y Ortiz, *La Seguridad Jurídica y el Registro de la Propiedad Intelectual*, 96 Revista General de Legislación y Jurisprudencia 595, 605, Núm. 4 (1988) ("La Ley de 1879 nunca dijo que la inscripción de la propiedad intelectual fuese 'constitutiva'. La Ley partía de una inscripción 'estimulada' y reconociendo que la 'creación' daba vida a la propiedad intelectual y que desde la misma existía dicho derecho, señalaba un plazo para que el autor pudiese inscribir su obra, y si no lo hacía su obra podía pasar provisionalmente al dominio público, y si transcurrían diez años sin inscribirla, la obra pasaba definitivamente al dominio público.").

reconocimiento por el Estado del derecho de propiedad intelectual, ni una *conditio iuris* para su protección jurídica".). El rechazo a las formalidades de la legislación anterior fue tan rotundo que se ordenó la aplicación retroactiva de la nueva ley, de manera que los autores cuyas obras habían pasado al dominio público por no haber sido inscritas en el Registro bajo la ley derogada, volverían a estar protegidos por la ley vigente. Disposiciones Transitorias, Segunda, Ley 22 de 11 de noviembre de 1987. Hoy en día, los tratadistas españoles siguen mirando con recelo la obligación de inscripción que establecía el anterior estatuto.

> Y destacaríamos sobre todos uno de sus desaciertos más graves: la imposición del depósito de la obra —y más aún, de la inscripción del derecho— en el Registro de la Propiedad Intelectual, como un requisito formal que condicionaba la protección jurídica, hasta el punto de que la obra publicada y no inscrita por su autor en el plazo de un año, podía ser publicada y reproducida por cualquiera durante un plazo de 10 años, después del cual podía ser registrada por el autor dentro de otro plazo de un año, cayendo definitivamente en el dominio público si no lo hiciere. Contra esta medida hay que tener en cuenta que en la propiedad intelectual no puede estimarse de ningún modo el registro de la obra como una condición de la tutela jurídica, sino que aquél debe quedar reducido a un medio de prueba de la paternidad del autor y de la identidad de la obra, que cabe sean suplidos por otros medios diferentes.

Hermenegildo Baylos Corroza, *Tratado de Derecho Industrial*, Civitas, España, 3ra ed., 2009, pág. 719 (Citas omitidas).

Veamos ahora la experiencia en los Estados Unidos, donde aun cuando las formalidades siempre han estado presentes en la regulación sobre los derechos de autor, sin duda también se puede apreciar una tendencia hacia su reducción. *Véanse*

Roger E. Schechter & John R. Thomas, *Intellectual Property: The Law of Copyrights, Patents and Trademarks*, Thomson West, 2003, págs. 75-93; Jane C. Ginsburg, *The United States Experience with Mandatory Copyright Formalities: A Love/Hate Relationship*, 33 Colum. J.L. & Arts 311 (2010); Shira Perlmutter, *Freeing Copyright from Formality*, 13 Cardozo Arts & Ent. L.J. 565 (1993); Arthur Levine, *The End of Formalities: No More Second-class Copyright Owners*, 13 Cardozo Arts & Ent. L.J. 553 (1993).

En los Estados Unidos, desde el año 1790, un requisito indispensable para gozar de la protección de los derechos de autor bajo la legislación federal, era presentar la portada de la obra en la Corte de Distrito donde residiera el autor. Ley de 31 de mayo de 1790, 1 Stat. 124 (1790) (derogada). Con la aprobación del *Copyright Act* de 1909, dicha presentación o inscripción —la cual se podía realizar en la Oficina de Derechos del Autor (*Copyright Office*)— ya no era necesaria para tener la protección de la ley durante un primer período de veintiocho (28) años desde que la obra fuera publicada. Ley de 4 de marzo de 1909, 35 Stat. 1075 (1909) (derogada). Sin embargo, era necesario depositar e inscribir la obra para gozar de un subsiguiente período de protección de igual duración, así como para poder presentar acciones por violación a los derechos de autor. *Id.* Otra formalidad que estableció este estatuto fue el requerimiento de plasmar el aviso del derecho de autor ("C*opyright, Copr.,* ©"). Los autores debían incluir en sus obras publicadas

dicho aviso, en una forma y lugar específico según la obra de la cual se tratara, y si no lo hacían, su obra pasaba al dominio público.

Tras varios años de estudios y discusiones sobre una posible reforma del derecho de autor, se promulgó el *Federal Copyright Act* de 1976, *supra*. Aunque esta ley mantuvo las formalidades ya descritas, minimizó las consecuencias de su incumplimiento proveyendo, entre otros mecanismos, un período de gracia de cinco (5) años a partir de la publicación para inscribir la obra y realizar esfuerzos razonables para subsanar la omisión del aviso de los derechos de autor. 17 U.S.C.A. sec. 405(a)(2). Ahora bien, en 1988, el Congreso de los Estados Unidos aprobó la ley para implementar en su territorio la Convención de Berna y así adherirse a los demás países miembros de la Unión que allí se estableció con la intención de proteger los derechos de autor bajo un marco internacional homogéneo. *Berne Convention Implementation Act of 1988*, Pub. L. No. 100-586, 102 Stat. 2853 (1988). Esta legislación significó un gran paso hacia la flexibilización de requisitos formales para la protección de los derechos de autor.

En primer lugar, se suprimió la exigencia de incluir en la obra publicada el aviso de derecho de autor como condición para ostentar la protección legal. Desde entonces el referido aviso es meramente voluntario, aunque se estimula su inclusión permitiendo que el autor que lo incluya, y posteriormente inicie un pleito por violación a sus derechos de autor, se oponga a que el demandado alegue desconocer que

la obra estaba protegida para no sufragar daños estatutarios. 17 U.S.C.A. secs. 401(d), 402(d). En segundo lugar, en lo que respecta a obras originadas en otros países de la Unión de Berna, quedó eliminado el requerimiento de inscribir el derecho de autor antes de poder instar una acción ante los tribunales por violación a dicho derecho. 17 U.S.C.A. sec. 411(a). No obstante, tal obligación sigue vigente para obras originadas en los Estados Unidos, ello a pesar de que la inscripción no es una condición para la protección de los derechos de autor. 17 U.S.C.A. sec. 408(a). Cabe aclarar que lo que se requiere es llevar a cabo el trámite administrativo para lograr la inscripción, no la efectiva inscripción del derecho, pues aun si ésta es denegada tras la evaluación de la solicitud de inscripción, el autor está autorizado a presentar su acción por violación a sus derechos de autor. 17 U.S.C.A. sec. 411(a).

Finalmente, en 1990 el Congreso aprobó la *Visual Artists Rights Act* ("VARA") para incorporar —aunque de una forma muy limitada— entre los derechos de autor reconocidos en la jurisdicción federal, los derechos morales de atribución e integridad sobre ciertas obras de artes visuales. Pub. L. No. 101-650, 104 Stat. 5128 (1990); 17 U.S.C.A. sec. 106A. Empero, es meritorio señalar que todos los autores que presentan reclamaciones ante los foros judiciales federales para hacer efectivos estos derechos morales, están exentos de tener que inscribir previamente su derecho de autor en la Oficina de Derechos del Autor. 17 U.S.C.A. sec. 411(a).

Este breve recuento nos permite apreciar que los sistemas de protección de derechos de autor en todo el mundo, y en España y Estados Unidos en particular, se han modificado para proveer garantías y salvaguardas efectivas, libres de formalidades, para los autores. Todos tratan de alcanzar un sistema justo, en el que la labor intelectual pueda ser cosechada y promovida sin trabas técnicas ajenas al quehacer creativo. Contando ahora con este bagaje, examinemos la controversia de autos.

## III.

La parte recurrida sostiene que el artículo 359*ll* de la Ley de Propiedad Intelectual, 31 L.P.R.A. sec. 1402d, no permite que se protejan judicialmente los derechos morales de la parte peticionaria ya que dispone que para "gozar de los beneficios de esta Ley es necesario haber inscrito el derecho y las obras que lo sustentan en el Registro", y el peticionario no tenía inscrita su obra cuando presentó esta acción. Le asiste la razón a los recurridos.

Es indispensable recordar que cuando se aprobó la Ley de Propiedad Intelectual en el 1988, mediante la cual se creó el Registro de la Propiedad Intelectual, la Asamblea Legislativa consideraba que el registro que existía en España era simplemente un mecanismo "que facilit[a] la labor de determinar si en circunstancias determinadas se ha cometido una violación". Exposición de Motivos, Ley Núm. 96 de 15 de julio de 1988. Con ello en mente, se aprobó la legislación para lograr que la comunidad intelectual de nuestro país gozara de la "mayor protección de sus derechos". *Id*. Por

eso se creó el Registro, para que "permita la más adecuada defensa de los derechos de esta clase *facilitando* la inscripción y protección de todos los *derechos inherentes* a los integrantes de esta clase". *Id*. (Énfasis suplidos). Asimismo, las enmiendas hechas a la ley en el 1996 tuvieron el propósito de facilitar su implantación "en protección de los derechos de la comunidad intelectual del país". Exposición de Motivos, Ley Núm. 56 de 24 de junio de 1996.

Sin embargo, a través del artículo 359*ll*, dichas enmiendas también introdujeron a nuestra Ley de Propiedad Intelectual la inscripción en el Registro —de la obra y el derecho moral— como requisito para el goce y disfrute de las protecciones que brinda la ley. *Véase* Pedro G. Salazar, *La protección legal del autor puertorriqueño*, Ed. UPR, San Juan, 2000, pág. 295. Cónsono con lo anterior, sólo hemos resuelto que no es necesaria la inscripción de la obra en el Registro en aquellas situaciones peculiares en las cuales se alega que otra persona se atribuyó la autoría de la obra; es decir, cuando se invoca el derecho moral de atribución. *Harguindey Ferrer v. U.I.*, *supra*.

De manera que, actualmente y como regla general, la inscripción de la obra y el derecho moral en el Registro de la Propiedad Intelectual, sí es requerida por nuestro ordenamiento jurídico para poder disfrutar plenamente de los derechos morales de autor. Ello, ya que no es posible tramitar una acción judicial para sus reparos sin antes contar con la referida inscripción, según ordena el artículo

359*ll.*    Aunque  el  reclamo  del  peticionario  de  que reconozcamos  el  ejercicio  y  la  protección  de  los  derechos morales  de  autor  –sin  necesidad  de  inscribir  la  obra  en  el Registro–  tiene  eco  en  la  tendencia  libre  de  formalidades  que ha  seguido  la  comunidad  internacional,  nuestra  Asamblea Legislativa  ha  optado  por  un  esquema  distinto.    Es  a  dicha Rama  de  Gobierno  a  quien  corresponde  seleccionar  el  modelo  a seguir  y  a  quien  deben  dirigirse  los  reclamos  de  reforma.[6]

---

[6] En  caso  que  la  Rama  Legislativa  tenga  a  bien  reevaluar  el desarrollo  internacional  de  la  protección  de  los  derechos morales  de  autor,  un  asunto  a  considerar  es  si  exigir  a nuestros  autores  que  inscriban  sus  obras  para  poder  defender su  personalidad  y  dignidad,  según  fue  plasmada  en  el  trabajo de  su  autoría,  en  efecto  podría  dejar  sin  derechos  a  la  mayor parte  de  nuestra  comunidad  intelectual,  que  por  razones diversas,  no  puedan  acceder  al  Registro.    Piénsese,  por ejemplo,  en  nuestros  artesanos;  afanosos  artistas  que perpetúan  nuestra  cultura  y  tradiciones.    Ellos  componen  un numeroso  grupo  que  constantemente  está  creando  nuevas  obras. ¿Tendrían  ellos  que  acudir  al  Registro  cada  vez  que  produzcan una  nueva  pieza?    Podrían  ser  varias  las  limitaciones  a  las que  se  tengan  que  enfrentar  para  poder  tan  siquiera personarse  al  Registro,  sin  mencionar  las  dificultades económicas  que  tendrían  que  sobrevenir  para  satisfacer  los costos  de  cada  inscripción.    *Véase*  Roger  E.  Schechter  &  John R.  Thomas,  *Intellectual  Property:  The  Law  of  Copyrights, Patents  and  Trademarks*,  Thomson  West,  2003,  pág.  89 (Traducción  nuestra):

> "Las  virtudes  de  un  sistema  de  inscripción  de derechos  de  autor  son  similares  a  las  de  cualquier otra  forma  de  registro  organizado.    Establece  un sistema  de  documentos  públicos  que  ayuda  a  los potenciales  usuarios  del  material  protegido  por  los derechos  de  autor  a  localizar  los  propietarios  del material,  de  manera  que  puedan  obtener  las autorizaciones  necesarias.    Una  visión  económica podría  decir  que  el  sistema  reduce  los  costos  de transacción.
> Por  otro  lado,  para  ciertos  autores,  el procedimiento  de  inscripción  podría  ser  demasiado oneroso  o  costoso.    A  diferencia  de  las  grandes casas  publicadoras  o  disqueras  que  pueden  emplear personal  dedicado  exclusivamente  a  cumplimentar solicitudes  para  la  inscripción  de  los  derechos  de

No obstante lo anterior, debemos señalar que el razonamiento enunciado por el Tribunal de Apelaciones, respecto a la necesidad de que el autor cuente con la inscripción al momento en que sufre la alegada violación de sus derechos morales, no es acertado. Todo lo que exige la ley es la inscripción de la obra y el derecho, no dispone que ésta deba llevarse a cabo con anterioridad a la transgresión. 31 L.P.R.A. sec. 1402d.

La interpretación que propone el foro recurrido es una similar a aquella que se le daba al artículo 36 de la antigua Ley Española de 1879. Bajo dicha postura el Registro sería un mecanismo constitutivo de derechos, pues al exigir la inscripción antes de una posible violación en efecto se estaría condicionando la existencia de los derechos morales al acto previo de la inscripción. Ése no es el propósito de nuestro Registro. Un derecho tan cercano a la personalidad del sujeto, como el derecho moral, no puede quedar tronchado por la omisión de una formalidad meramente optativa. Mucho menos cuando ésta ha sido pensada y diseñada precisamente para facilitar y promover la protección de ese derecho. Exposición de Motivos, Ley Núm. 56 de 24 de junio de 1996.

_____

autor, la banda local, el fotógrafo comercial independiente y el cineasta novato podrían no tener los recursos para dedicarlos a cumplir con el sistema de inscripción, pero aun así parece extremadamente injusto declarar perdidos los derechos de autor sobre estas obras meramente porque los autores encuentran difícil cumplir con el sistema de inscripción. Por lo tanto, la legislación puede ser vista como un acuerdo en punto medio —alentando la inscripción al máximo posible, para así obtener sus beneficios, sin imponer consecuencias draconianas sobre aquéllos que no inscriban."

Como señaláramos, los derechos morales del autor nacen con la mera creación de la obra. 31 L.P.R.A. sec. 1401a; *Harguindey Ferrer v. U.I.*, *supra*, pág. 22; *Ossorio Ruiz v. Srio. de la Vivienda*, *supra*, pág. 55. Por ello se inscribe en el Registro no sólo las obras, sino *el derecho* que nace fuera del Registro. 31 L.P.R.A. secs. 1402d, 1402f. *Véase* Art. 5, Reglamento para la Presentación, Inscripción y Depósito de Obras en el Registro de la Propiedad Intelectual, Reglamento Núm. 6157 del Departamento de Estado, 31 de mayo de 2000 ("La inscripción de la obra en el Registro tendrá el efecto de reservar a favor de su autor o titular los derechos morales que su creación haya originado y dar fe pública de ese hecho para su protección contra cualquier violación.").

Resolvemos pues que es necesario inscribir las obras y el derecho moral de autor en el Registro de la Propiedad Intelectual para que se puedan presentar acciones judiciales ante la violación de los derechos de autor reconocidos en nuestra legislación; salvo cuando se alegue transgresión al derecho de atribución. Aclaramos, sin embargo, que la inscripción es necesaria al momento de procurar la providencia judicial y no antes. Por lo tanto, el autor que sufre la mutilación de su obra no inscrita, tiene a su haber los derechos morales que reconoce la Ley de Propiedad Intelectual, si bien no podrá ejercerlos en los tribunales sin antes acudir al registro de la Propiedad Intelectual. Otra interpretación de la ley daría al traste con el llamado contenido en el propio estatuto, a los efectos de que sea interpretado y aplicado "de forma que auxilie y haga

efectivos en la práctica para los autores puertorriqueños" sus derechos de autor.  31 L.P.R.A. sec. 1402m.

Finalmente, debemos subrayar otros aspectos importantes del Registro de la Propiedad Intelectual.  Por un lado, el Registro permite que los autores que inscriban sus obras:  1) puedan inscribir a su vez contratos que suscriban respecto a la obra ya inscrita; 2) plasmen en ellas la marca acreditativa de la inscripción (®); 3) obtengan certificaciones de las constancias del registro, lo cual constituye un documento oficial admisible en procedimientos judiciales y administrativos; y 4) si se trata del autor de un libro, goza de unas protecciones especiales ya que el Registro impone ciertas obligaciones al editor, importador o exportador de su libro.  31 L.P.R.A. secs. 1402d-02e, 1402h-02j.  De manera que aunque se trata de un acto voluntario, la inscripción en el Registro de la Propiedad Intelectual provee varios beneficios a los autores que decidan utilizarlo. Sobre todo, aquel autor que inscriba su obra y su derecho tendrá a su favor una presunción de autoría sustentada en la fe pública que sólo puede otorgar el Registro.  Ello representa un medio probatorio valioso que estaría disponible para promover una reclamación o establecer una defensa.

De otra parte, la sociedad también encuentra beneficios en el Registro ya que le sirve como banco de información cultural, en el cual se pueden perpetuar las maravillas del ingenio puertorriqueño.  Igualmente, sus constancias pueden ayudar a contactar el autor de cierta obra o a determinar la

duración de la protección que le brinda la ley. En fin, dicha inscripción concede beneficios importantes que no pueden obtenerse de otra forma.

IV.

En el presente caso, los foros recurridos desestimaron la acción de violación a derechos morales de autor en la cual se alega el uso y mutilación de la obra del demandante de forma no autorizada. La razón para ello fue que el Sr. Negrón Miró no tenía su obra y derechos inscritos en el Registro de la Propiedad Intelectual. No erraron al así actuar. Los derechos morales del autor nacen con la misma creación de la obra pero, según hoy resolvemos, su ejercicio en los tribunales depende de que sean inscritos en el Registro de la Propiedad Intelectual. No empece a ello, ya que hoy nos expresamos por primera vez respecto al momento en el cual se hace necesaria la inscripción, ordenamos la desestimación de la presente causa de acción sin perjuicio. Así modificada, confirmamos la sentencia emitida por el Tribunal de Apelaciones.

Se dictará sentencia de conformidad.


Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan C. Negrón Miró y Mayra Nieves, la Sociedad Ganancial que ambos componen<br><br>    Peticionarios<br><br>        v.<br><br>Roberto Vera Monroig y Jane Doe, Sociedad Ganancial compuesta por ambos, Compañía de Impresos XYZ, Inc., Compañía de Rotulaciones XYZ, Inc. demandados desconocidos<br><br>    Recurridos | CC-2009-871 |

SENTENCIA

San Juan, Puerto Rico, a 16 de junio de 2011

Por los fundamentos expresados en la Opinión que antecede los cuales se incorporan íntegramente a la presente, se dicta sentencia desestimando la presente causa de acción sin perjuicio. Así modificada, se confirma la sentencia emitida por el Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Rivera García concurren con el resultado sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo